RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

GEORGE RUDY CUNDIFF; CHRISTOPHER SETH
CUNDIFF,

　　　　　　　*Defendants-Appellants.*

Nos. 05-5469/5905; 07-5630

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 01-00006—Joseph H. McKinley, Jr., District Judge.

Argued: December 9, 2008

Decided and Filed: February 4, 2009

Before: MARTIN and McKEAGUE, Circuit Judges; COLLIER, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Leslie E. Nunn, LESLIE E. NUNN, P.C., Cynthiana, Indiana, for Appellants. Jennifer Scheller Neumann, David Fishback, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Leslie E. Nunn, LESLIE E. NUNN, P.C., Cynthiana, Indiana, for Appellants. Jennifer Scheller Neumann, David Fishback, Ellen J. Durkee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. James Graham Murphy, NATIONAL WILDLIFE FEDERATION, Montpelier, Vermont, for Amicus Curiae.

_____

## OPINION

_____

　　BOYCE F. MARTIN, JR., Circuit Judge. After eight years of failed negotiations and ignored orders, the United States sued George Rudy Cundiff (who goes by Rudy)

_____

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

and his son, Christopher Seth Cundiff (who goes by Seth), seeking injunctive relief and civil penalties against them for discharging "pollutants" into "waters of the United States" without a permit in violation of the Clean Water Act. 33 U.S.C. § 1362. The district court granted summary judgment for the government, imposed injunctive relief in the form of a restoration plan for the Cundiffs' wetlands, and imposed a civil penalty of $225,000. All but $25,000 of that penalty was suspended, however, provided that the Cundiffs implemented the restoration plan. The district court also dismissed the Cundiffs' array of statutory, common law, and constitutional counterclaims. While the original appeal in this case was pending, the Supreme Court issued its splintered ruling in *Rapanos v. United States*, 547 U.S. 715 (2006), which defined the Act's jurisdiction over "waters of the United States." In light of *Rapanos*, we returned the case to the district court to reconsider whether jurisdiction was proper over the Cundiffs' wetlands. The district court determined that it was because the Cundiffs' wetlands were in fact waters of the United States, and the Cundiffs appealed. We affirm the district court on all grounds.

## I.

Defendants Rudy and Seth Cundiff own two adjacent tracts of land in Muhlenberg County, Kentucky. Their properties together sit next to Pond and Caney Creeks, which are tributaries of the Green River. The Green River, in turn, flows into the Ohio River. In 1990, Rudy Cundiff bought the southern tract, which contains roughly eighty-five acres of wetlands and an upland area where his house sits. When Rudy bought it, portions of the wetlands contained exceptionally acidic orangish to reddish colored water that had drained out of an abandoned coal mine located on a neighbor's nearby property. As a result, locals referred to the Cundiffs' property as a putrid eyesore, and this stagnant, discolored water caused the wetlands to become a festering mosquito haven—though the Cundiffs knew all this when they bought it.[1]

---

[1] Singer-songwriter John Prine has colorfully recounted Muhlenberg County's sordid ecological history:

And daddy won't you take me back to Muhlenberg County / Down by the Green River where Paradise lay / Well, I'm sorry my son, but you're too late in asking / Mister Peabody's coal train has hauled it away . . . . / Then the coal company came with the world's largest shovel / And they

Shortly after his purchase, Cundiff began excavating drainage ditches and clearing trees to make the wetlands suitable for farming.

In October 1991, federal officials from the Army Corps of Engineers and state officials from the Kentucky Division of Water observed ditches, artificially filled wetlands, and mechanically cleared land on the wetlands. The Corps suspected possible Clean Water Act violations. Rudy had failed to obtain a section 404 permit as required for such dredging and filling activities, and further inspection revealed that Cundiff had excavated ditches in the wetlands and placed dredged material into them as filler (known as "sidecasting"). Consequently, the Corps sent him a cease-and-desist letter "specifically prohibiting any further activity involving the placement of excavated or fill material into these jurisdictional wetlands" without a federal permit.

Federal and state officials then began meeting with Cundiff in 1992, though they reached no agreement. Instead, he insisted on converting the wetlands into farmland and continued to drain and clear the property. The Corps referred the matter to the Environmental Protection Agency. Over the next several years, Cundiff continued his draining and ditch digging activities, simply ignoring whatever government directives came his way. In 1997 he planted wheat on the southern tract, and government officials observed downed trees in that area. The EPA issued an Order of Compliance informing him that he had violated the Clean Water Act by depositing fill material into waters of the United States without authorization, and it directed him to "immediately cease participating in or causing any additional discharges" of pollutants.

In 1998 Rudy's son, Seth, purchased a tract of land located north of Rudy's which contains roughly 103 acres of wetlands. (Seth leases this property back to Rudy for the exact amount of the mortgage payment.) Rudy quickly began excavating and clearing that property as well, activity of which Seth was aware. In October 1998, officials from the EPA informed Rudy Cundiff that he needed a permit for this work too.

---

tortured the timber and stripped all the land / Well, they dug for their coal 'til the land was forsaken / Then they wrote it all down as the progress of man . . . .

JOHN PRINE, *Paradise, on* JOHN PRINE (Atlantic Records 1971).

Rudy—somewhat surprisingly—said that, though he knew he needed a permit, he thought the Corps would never grant him one so he planned on digging his ditches anyway. He eventually completed a two-hundred foot ditch through the wetlands that extended all the way to Caney Creek, and the dredged material was "sidecast" into the wetlands to dry them out to make them arable. In 1999, Kentucky officials told Cundiff that he was destroying wetlands without a permit in violation of state law (he ignored this too), and the EPA issued additional Orders of Compliance to both Rudy and Seth Cundiff requiring them to cease their excavation activities and to restore the unauthorized ditches by refilling them. The Cundiffs responded to these orders as they had to the others.

The United States finally sued both Rudy and Seth Cundiff, alleging that they violated Section 301(a) of the Clean Water Act for discharging pollutants into waters of the United States without a permit. 33 U.S.C. § 1311(a). The district court granted the United States's motion for summary judgment, thus finding the Cundiffs liable, and, after a bench trial, permanently enjoined them from discharging dredged or fill material or any other pollutants into waters of the United States (which it concluded that the Cundiffs' wetlands were) and imposed a civil penalty of $225,000 but suspended $200,000 of that pending the Cundiffs' adequate implementation of the restoration plan. The defendants appealed, and while that appeal was pending, the Supreme Court decided *Rapanos v. United States*, 547 U.S. 715 (2006), which addressed the scope of the term "waters of the United States" in the Clean Water Act. The parties jointly moved for a limited remand from this Court so the district court could reconsider whether jurisdiction over the wetlands was proper, and this Court remanded the case on that question. The district court concluded that the Cundiffs' wetlands were "waters of the United States," and the Cundiffs now appeal the district court's: (1) grant of summary judgment in the government's favor; (2) imposition of a civil penalty and injunctive relief; and (3) the dismissal of their counterclaims.

**II.**

We review the district court's legal conclusions de novo, *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005), and its factual findings for clear error. *Id.* The imposition of a monetary penalty and injunctive relief is reviewed for abuse of discretion. *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1205 (6th Cir. 1995); *United States v. Norris*, 937 F.3d 286, 288 (6th Cir. 1991). We review the dismissal of the Cundiffs' counterclaims de novo. *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002).

**III.**

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the Act prohibits "the discharge of any pollutant by any person" except in compliance with the Act. 33 U.S.C. § 1311(a). "[D]ischarge of any pollutant" is broadly defined to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). In turn, "pollutant" is defined to include not only traditional contaminants, but also solids such as "dredged spoil, . . . rock, sand [and] cellar dirt." 33 U.S.C. § 1362(6). The Act defines "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

The Act also sets up two permit schemes. Section 404(a) authorizes the Secretary of the Army (through the United States Army Corps of Engineers), or a state with an approved program, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Section 402 authorizes the Environmental Protection Agency (or a state with an approved program) to issue a National Pollutant Discharge Elimination System (NPDES) permit for the discharge of pollutants other than dredged or fill material. 33 U.S.C. § 1342. The Corps and the EPA share responsibility for implementing and enforcing Section 404. *See*, *e.g.,* 33 U.S.C. § 1344(b)-(c).

Although at one time the term "navigable waters" included only waters that were navigable in fact, *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1871), "navigable waters" is a defined term in the Act that expressly includes all "waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court has repeatedly recognized that, with this definition, Congress "evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). As a result, the Corps and EPA have put out substantively equivalent regulatory definitions of "waters of the United States," *compare* 33 C.F.R. § 328.3(a), *with* 40 C.F.R. § 230.3(s), that define it to encompass not only traditional navigable waters of the kind susceptible to use in interstate commerce, but also tributaries of traditional navigable waters and wetlands adjacent to covered waters. *See* 33 C.F.R. § 328.3(a)(1), 328(3)(a)(5), 328(a)(7).

### A.     Are the Wetlands "Waters of the United States"?

### 1.     *Rapanos*

*Rapanos* involved two consolidated cases in which the Act had been applied to actual or proposed discharges of pollutants into wetlands adjacent to nonnavigable tributaries of traditional navigable waters. 547 U.S. at 729-30. Although there was no single majority opinion, all the Justices agreed that the statutory phrase "waters of the United States" encompasses some waters not navigable in the traditional sense. *See id.* At 731 (Scalia, J., plurality opinion); *id.* at 767-68 (Kennedy, J., concurring in the judgment); *id.* at 793 (Stevens, J., dissenting). The four-Justice plurality interpreted the Act to cover "relatively permanent, standing, or continuously flowing bodies of water," 547 U.S. at 739, that are connected to traditional navigable waters, *id.* at 742, as well as wetlands with a continuous surface connection to such water bodies. *Id.* at 732 n.5 (observing that the Act's reference to "relatively permanent" waters "d[id] not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary

circumstances, such as drought," or "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months").

Justice Kennedy, writing only for himself, interpreted the term to cover wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring in the judgment) (quoting *Solid Waste Agency v. United States Army Corps. of Eng'rs.*, 531 U.S. 159, 167 (2001)).  He explained:

> [W]etlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

*Id.* at 780. And Justice Kennedy, relying on *Riverside Bayview*, concluded that the Corps' assertion of jurisdiction over "wetlands adjacent to navigable-in-fact waters" may be met "by showing adjacency alone." *Id.*  On the other hand, where the wetlands are adjacent to nonnavigable tributaries, "[a]bsent more specific regulations," Justice Kennedy would require the government to "establish a significant nexus on a case-by-case basis." *Id.* He therefore concurred in the judgment vacating the lower court's decision and voted to remand the case for more fact-finding on whether the government could prove the existence of a significant nexus between the wetlands and nearby navigable-in-fact waters.

The dissenters, with Justice Stevens writing, would have upheld the determination that the wetlands at issue were "waters of the United States" as a reasonable agency interpretation of the Act under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).  In the dissenters' view, any "significant nexus" requirement—insofar as the Act contained one—would be "categorically satisfied as to wetlands adjacent to navigable waters or their tributaries." *Rapanos*, 547 U.S. at 807-08.

Parsing any one of *Rapanos*'s lengthy and technical statutory exegeses is taxing, but the real difficulty comes in determining which—if any—of the three main opinions lower courts should look to for guidance. As the Chief Justice observed: "It is unfortunate that no opinion commands a majority of the Court on precisely how to read Congress' limits on the reach of the Clean Water Act. Lower courts and regulated entities will now have to feel their way on a case-by-case basis." *Id.* at 758 (Roberts, C.J., concurring) (citing *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003), and *Marks v. United States*, 430 U.S. 188 (1977)). The dissent, for its part, offered its view of what lower courts should do:

> In these cases, however, while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand. Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied—on remand each of the judgments should be reinstated if *either of those tests is met.*

*Rapanos*, 547 U.S. at 810 (emphasis added). Fortunately, as the following section explains, jurisdiction is proper here under each of the primary *Rapanos* opinions and therefore we do not have to decide here, once and for all, which test controls in all future cases.

## 2.     *Marks*-meets-*Rapanos*

In *Marks v. United States*, the Supreme Court instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (quoting *Gregg v. Georgia,* 428 U. S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). But all is not always so rosy. The Supreme Court has oft-noted *Marks*' limitations, stating that it is "more easily stated than applied to the various opinions supporting the result," *Grutter*, 539 U.S. at 325 (2003), and that "[i]t does not seem useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so

obviously baffled and divided the lower courts that have considered it," *Nichols v. United States*, 511 U.S. 738, 745 (1994) (quotations omitted).

In its short life, *Rapanos* has indeed satisfied any "bafflement" requirement. The first court to decide what opinion was controlling decided to ignore all of them and instead opted for earlier circuit precedent which it felt was clearer and more readily applied. *United States v. Chevron Pipe Line Co.*, 437 F. Supp. 2d 605, 613 (N.D. Tex. 2006). The Courts of Appeals have not fared much better. The Ninth Circuit has stated that Justice Kennedy's test applies in most instances, *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007), while the Eleventh Circuit has held that the Act's coverage may be established *only* under his test. *United States v. Robison*, 505 F.3d 1208, 1219-22 (11th Cir. 2007). By contrast, the First and the Seventh Circuits, though differing somewhat in their analyses, have followed Justice Stevens' advice and held that the Act confers jurisdiction whenever *either* Justice Kennedy's or the plurality's test is met.  *United States v. Johnson*, 467 F.3d 56, 60-66 (1st Cir. 2006); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 725 (7th Cir. 2006). This is the approach the district court here followed, largely in reliance on the First Circuit's thoughtful reasoning.

Taken literally, *Marks* instructs lower courts to choose the "narrowest" concurring opinion and to ignore dissents. *Marks*, 430 U.S. at 193. But what does "narrowest" mean? *Marks* considered an earlier Supreme Court obscenity decision, *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413 (1966), where the Court split on whether a particular work was protected by the First Amendment. In *Marks*, the Court determined that the *Memoirs* plurality's standard controlled because, while two Justices would have held that the First Amendment applies equally to all materials—whether obscene, hardcore, or G-rated, *id.* at 433 (Douglas, J., concurring); *id.* at 421 (Black, J., concurring)—the plurality would have afforded protection only to non-obscene materials, *id.* at 419-20, and therefore that concurring opinion was doctrinally the "narrowest."

The so-called *Marks* rule in fact derived from the Court's earlier opinion in *Gregg v. Georgia*, 428 U.S. 153 (1976). *Gregg* had interpreted *Furman v. Georgia*, 408 U.S. 238 (1972), in which a majority found that Georgia's death penalty scheme was unconstitutional. Two Justices believed that the death penalty was per se unconstitutional, while three others merely stated that it was unconstitutional as then administered in Georgia. So the *Gregg* Court stated that "[s]ince five Justices wrote separately in support of the judgments in *Furman*, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." 428 U.S. at 169 n.15.

As these cases indicate—and contrary to assertions by the Cundiffs and their *amici*—*Marks* does not imply that the "narrowest" *Rapanos* opinion is whichever one restricts jurisdiction the most. But it also makes little sense for the "narrowest" opinion to be the one that restricts jurisdiction the least, as the government's *amici* allege; the ability to glean what substantive value judgments are buried within concurring, plurality, and single-Justice opinions would require something like divination to be performed accurately. Instead, "narrowest" opinion refers to the one which relies on the "least" doctrinally "far-reaching-common ground" among the Justices in the majority: it is the concurring opinion that offers the least change to the law. *See Johnson v. Bd. of Regents of the Univ. Of Ga.*, 263 F.3d 1234, 1247 (11th Cir. 2001); *Johnson*, 467 F.3d at 63. In both *Memoirs* and *Furman* the controlling opinion was less doctrinally sweeping. The *Memoirs* controlling opinion did not agree that obscenity laws per se violated the Constitution, and the *Furman* controlling opinion did not agree that the death penalty was per se unconstitutional.

Yet problems await. For cases like *Furman* and *Memoirs*, *Marks*' application is straightforward. But when "one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic." *King v. Palmer*, 771 F.2d 771, 782 (D.C. Cir. 1991) (en banc). Specifically, "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." *Id.* at 781. Where no standard put

forth in a concurring opinion is a logical subset of another concurring opinion (or opinions) that, together, would equal five votes, *Marks* breaks down.

Enter *Rapanos*. Although "in most cases in which [Justice Kennedy] concludes that there is no federal authority he will command five votes (himself plus the four Justices in the *Rapanos* plurality)," in other cases Justice Kennedy "would vote against federal authority only to be outvoted 8-to-1 (the four dissenting Justices plus the members of the *Rapanos* plurality) because there was a slight surface hydrological connection." *Gerke*, 464 F.3d at 725. Indeed, there is quite little common ground between Justice Kennedy's and the plurality's conceptions of jurisdiction under the Act, and both flatly reject the other's view. *See Rapanos*, 547 U.S. at 756 (Scalia, J., plurality opinion) ("[Justice Kennedy's] test simply rewrites the statute."); *id.* at 778 (Kennedy, J., concurring) ("[T]he plurality reads nonexistent requirements into the Act.").[2]

Thus, because *Rapanos* is not easily reconciled with *Marks*, the question becomes what to do. Fortunately, we need not reconcile *Rapanos* with *Marks*. Here, jurisdiction is proper under both Justice Kennedy's and the plurality's tests (and thus also the dissent's). Recently, this Court addressed an analogous situation:

> Because the Supreme Court divided 4-1-4 in [*Missouri v. Seibert*, 542 U.S. 600 (2004)], there has been some confusion about whether the plurality or concurring opinion controls. Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent, though others have raised doubts about whether his concurrence actually represents the narrowest grounds for decision. We do not need to resolve this issue because regardless of the applicable framework Lopez's statement must be suppressed.

*United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008) (citations omitted). As the next section demonstrates, jurisdiction is proper here under both Justice

---

[2] The Pacific Legal Foundation argues that the plurality's test is a logical subset of Justice Kennedy's test. Amicus Br. at 8. But this is unpersuasive. Not only is there a theoretical possibility that the tests do not align, *Johnson*, 467 F.3d at 64, the Eleventh Circuit may have addressed such a case. *Robison*, 505 F.3d at 1223 ("This case arguably is one in which Justice Scalia's test may actually be more likely to result in CWA jurisdiction than Justice Kennedy's test.").

Kennedy's and the plurality's tests, so we leave ultimate resolution of the *Marks*-meets-*Rapanos* debate to a future case that turns on which test in-fact controls.[3]

### 3.    Jurisdiction is proper under both tests

*Justice Kennedy's test.* Under this test, the Clean Water Act applies to wetlands that "possess a significant nexus to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 758. This nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable." *Id.* at 755. By contrast, "[w]hen . . . wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory terms 'navigable waters.'" *Id.* This standard must be met on a case-by-case basis. *Id.*

The district court found that the Cundiffs' wetlands have a significant nexus with the navigable-in-fact Green River, via Pond and Caney Creeks, which are tributaries of that river. The court credited the government's expert who testified that the wetlands perform significant ecological functions in relation to the Green River and the two creeks, including: temporary and long-term water storage, filtering of the acid runoff and sediment from the nearby mine, and providing an important habitat for plants and wildlife. And the court found that the Cundiffs' alterations—unauthorized ditch digging, the mechanical clearing of land, and the dredging of material and using it as filler—have undermined the wetlands' ability to store water which, in turn, has affected the frequency and extent of flooding, and increased the flood peaks in the Green River. Thus, it has "impact[ed] navigation, crop production in bottomlands, downstream bank erosion, and sedimentation." *United States v. Cundiff*, 480 F. Supp. 2d 940, 945 (W.D. Ky. 2007) (quoting *Report of Dr. Lyndon C. Lee*, J.A. 172). The district court further credited another government expert's testimony who stated that Rudy Cundiff's ditch digging had

---

[3]The Supreme Court recently denied *certiorari* in two cases presenting this question. *United States v. Robison*, 521 F.3d 1319 (11th Cir. 2008), *cert. denied sub nom.* as *United States v. McWane*, 77 U.S.L.W. 3324 (2008); *United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 116 (2008).

created channels so that the acid mine runoff would largely bypass his wetlands and instead flow more directly into Pond and Caney Creek and thus the Green River. It found that these channels cause "direct and significant impacts to navigation (via sediment accumulation in the Green River) and to aquatic food webs . . . that are not adapted to thrive in acid waters and/or sediment-choked environments." *Cundiff*, 480 F. Supp. 2d at 944 (quoting *Lee Report*). The record supports this conclusion and the district court found that the government's witnesses were credible, and so we cannot say that its conclusion was clearly erroneous.[4]

The Cundiffs do not really dispute these findings. Instead, they assert that a "significant nexus" may only be proved by "laboratory analysis" of soil samples, water samples, or through other tests. Though no doubt a district court could find such evidence persuasive, the Cundiffs point to nothing—no expert opinion, no research report or article, and nothing in any of the various *Rapanos* opinions—to indicate that this is the sole method by which a significant nexus may be proved such that the district court's finding was inherently improper. So the district court properly concluded that the government passed Justice Kennedy's test.

*The Plurality's test.* Under this standard, the government must make two showings to establish jurisdiction: "First, that the adjacent channel contains a 'wate[r] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Rapanos*, 547 U.S. at 742.

The first question is whether the adjacent property contains a "water of the United States." The district court held that jurisdiction was proper under the plurality's standard because the South Channel (located on the northern tract of the wetlands), and Pond and Caney Creeks were all "relatively permanent bodies of water connected to a

---

[4]For instance, if one dropped a poison into the Cundiffs' wetlands, the record indicates that it would find its way to the two creeks and the Green River, therefore indicating a significant chemical, physical, or biological connection between the wetlands and the nearby navigable-in-fact waters.

traditional interstate navigable water, the Green River." *Cundiff*, 480 F. Supp. 2d at 945. Regarding the South Channel, the district court found that the water flows through the channel into Pond Creek for all but a few weeks a year, the two creeks are open waterbodies with significant flowing water, and that both flow into the Green River. (Pond Creek itself is navigable in part.) So the first prong of the plurality's test is met.

The second question is whether the wetlands possess a "continuous surface connection" with the Green River and its tributaries. The Cundiffs argue that, because the wetlands are at a different elevation level than the two creeks and it is not readily apparent that water perpetually flows between them, there is no continuous surface connection. The district court, observing that *Riverside Bayview* stated that it is often ambiguous where the transition between water and dry land exactly exists, 474 U.S. at 132, 135 n. 9, disagreed and held that a continuous surface connection existed. Specifically, the Court observed that the inquiry was whether it was ambiguous where land stopped and water began, because otherwise the plurality's recognition of these gradual transitions would be "completely eviscerat[ed]." *Cundiff*, 490 F. Supp. 2d at 947.

We agree; the Cundiffs' argument proves too much. Although the term "continuous surface connection" clearly requires surface flow, it does not mean that only perpetually flowing creeks satisfy the plurality's test. Indeed, the *Rapanos* plurality, in tipping its hat to *Riverside Bayview*, fashioned its test to determine when *wetlands* were "waters of the United States," and therefore implicitly recognized that wetlands are neither navigable-in-fact nor even literally bodies of water. Instead, wetlands are merely "inundated or saturated" soil that can "support . . . under normal circumstances . . . a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). In other words, the plurality's test requires a topical flow of water between a navigable-in-fact waterway or its tributary with a wetland, and that connection requires some kind of dampness such that polluting a wetland would have a proportionate effect on the traditional waterway. If the Cundiffs' restrictive version of the plurality's test was accurate, then the plurality could have saved itself time and effort by saying that wetlands could never be "waters of the United States" and overruled

*Riverside Bayview*'s holding to the contrary. It did not do that; instead, the plurality went through a lengthy analysis and therefore the standard is broader than the Cundiffs assert.**[5]**

Further undermining their argument is the fact that the district court took note of the South Channel, which provides a largely uninterrupted permanent surface water flow between the wetlands and traditional waterways. The district court also found that the existence of additional (and substantial) surface connections between the wetlands and permanent water bodies "during storm events, bank full periods, and/or ordinary high flows" provides additional evidence of a continuous surface connection. *Cundiff*, 480 F. Supp. 2d at 947. Finally, Cundiff personally went a long way towards creating a continuous surface connection when he dug or excavated ditches to enhance the acid mine drainage into the creeks and away from his wetlands; in determining whether the Act confers jurisdiction, it does not make a difference whether the channel by which water flows from a wetland to a navigable-in-fact waterway or its tributary was man-made or formed naturally. Thus, we affirm the district court's determination that the Act confers jurisdiction over the Cundiffs' wetlands because both tests are met.**[6]**

### B.     *Summary Judgment Was Proper*

To establish liability under the Act, the government must prove that (1) a person (2) discharged a pollutant (3) from a point source (4) into waters of the United States (5) without a permit. 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1344(a), 1362(12). The Cundiffs do not contend that they are not persons (1), nor do they contend that no point

---

**[5]** Moreover, the Cundiffs' view that any interruption in flow means that jurisdiction under the plurality's test is improper would improperly exclude seasonal rivers and other such water bodies whose surface connection was not perpetual. At oral argument, the Cundiffs' counsel conceded that seasonal rivers and like water bodies would be covered by the plurality's test. *See Rapanos*, 547 U.S. at 732 n.5 (Scalia, J., plurality opinion) (observing that the Act's reference to "relatively permanent" waters "d[id] not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought," or "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months") (emphasis in original).

**[6]** Because the Cundiffs failed to properly raise or develop their Commerce Clause challenge to jurisdiction under the Act—and such a challenge would be rather tenuous anyway, *see, e.g., Gonzalez v. Raich*, 545 U.S. 1 (2005); *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326-27 (6th Cir. 1974); *United States v. Gerke Excavating, Inc.*, 412 F.3d 804 (7th Cir. 2005)—this argument is waived.

source was involved (3), and we have already determined that the wetlands here are waters of the United States (4). The Cundiffs contend that they have not discharged any pollutants (2) and, while they concede that they did not have a permit from the Corps, they assert that their activities fell into one of the relevant exemptions (though not the "recapture" provision) and thus were not required to have one (5).[7]

## 1. Discharge of a pollutant

The Clean Water Act defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Pollutant" includes not only traditional contaminants like "radioactive" or "chemical waste," but also basic solids like "dredged spoil, . . . rock, sand [and] cellar dirt." 33 U.S.C. § 1362(6). Latching onto "addition," the Cundiffs argue that the regulation defining a pollutant to include "sidecasting" goes beyond the authority the Act grants. In other words, they argue that it is unreasonable for the agency to interpret "discharge of a pollutant" to cover situations not involving the introduction of foreign material into the area.

Sidecasting involves the addition of dredged or excavated dirt from a removal site (here, the ditches the Cundiffs dug), to some disposal site (here, the Cundiffs' own wetlands). Sidecasting's purpose is to fill wetlands to dry them out. Although it is plausible to read "addition" as covering only completely foreign materials, that reading is foreclosed because "pollutant" is *defined* in the Act to specifically include "dredged spoil"—the Cundiffs would read that term out of the Act. Further, the Act is not concerned with mere "material," but instead with the addition of "pollutants"—material can be benign in one spot and seriously disruptive to the surrounding ecological system in another. As the Fourth Circuit has stated, once you have dug up something, it becomes

---

[7]The Cundiffs also assert that Seth Cundiff should have been dismissed from the lawsuit because, while he unquestionably owned part of the wetlands, he had leased them back to his father, Rudy Cundiff, and only Rudy engaged in any of the disputed activities. This argument fails, however, because even though he leased his tract, Seth Cundiff both owned it and had knowledge of Rudy Cundiff's activities. So the district court did not abuse its discretion in denying the motion to dismiss Seth Cundiff from the lawsuit.

> "dredged spoil," a statutory pollutant and a type of material that up until then was not present [in the wetlands]. It is of no consequence that what is now dredged spoil was previously present on the same property in [a] less threatening form . . . . What is important is that once a material was excavated from the wetland, its redeposit in the same wetland added a pollutant where none had been before.

*United States v. Deaton ("Deaton I")*, 209 F.3d 331, 335 (4th Cir. 2000); *see also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 920-21 (5th Cir. 1983). And even if the statute was ambiguous on whether the prohibition on the "addition" of pollutants included sidecasting, it is nevertheless a reasonable agency interpretation and must be accorded deference. *Chevron*, 467 U.S. at 843.[8]

The Cundiffs' other argument is that, if the regulations are nevertheless valid, then their dredging, filling, and mechanized landclearing activities nevertheless fall into the exception to the "discharge of dredged material" for "de minimis, incidental soil movement occurring during normal dredging operations." 51 Fed. Reg. 41,206, 41,232 (Nov. 13, 1986), codified at 33 C.F.R. § 323.2(d) (1990). Although this argument was probably waived, *see Thurman v. Yellow Freight Sys.*, 97 F.3d 833, 835 (6th Cir. 1996), the assertion that the Cundiffs merely left some fallback incidental to ditch digging cannot be credited: they actively filled the wetlands with dredged spoil and covered roughly 5.3 acres of wetlands next to about 11,900 feet of ditches. This goes far beyond being "de minimis."[9] Thus, they discharged a pollutant under the Act.

---

[8] Although not cited by either party, it is arguable that *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580, 584 (6th Cir. 1988), would in some ways support the Cundiffs' assertion that sidecasting is beyond the agency's authority. In that case this Court upheld an agency determination by the EPA that the discharge of pollutants from one body of water to a contiguous one was not an "addition" because it did not add a foreign pollutant. But *Consumers Power* is distinguishable because it was about agency deference to the EPA's interpretation of "addition," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 489-94 (2d Cir. 2001) (distinguishing *Consumers Power*)—indeed, the *Consumers Power* Court referred to the definition it was upholding as "circular." Moreover, *Consumers Power* was about normal dam operations that resulted in changes to water quality, while this case concerns a defendant who took proactive steps to purposefully alter and fill his wetlands.

[9] The current form of the regulations exclude "incidental fallback," 33 C.F.R. § 323.2(d)(3)(iii), and activities that do not have more than a "de minimis (i.e. inconsequential) effect on the area." *Id.* at § 323.2(d)(6). The Cundiffs' activities were neither "incidental" nor "inconsequential."

### 2.    Permit requirement

Although the Cundiffs do not dispute that they did not have a valid section 404 permit when digging ditches and clearing their wetlands, they nevertheless argue that their activities fell into one of the statutory exemptions, though not into the "recapture provision." *See* 33 U.S.C. § 1344(f)(1)-(2). Specifically, the Cundiffs argue that their activities fall into either the farming exception, § 1344(f)(1)(A), or the drainage ditch maintenance exception, § 1344(f)(1)(C). "The defendants bear the burden of establishing both that they qualify for one of the exemptions of § 1344(f)(1) and that their actions are not recaptured by § 1344(f)(2)." *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 955 (7th Cir. 2004).

The farming exception exempts from the permit requirement the "discharge of dredged or fill material" from "normal farming, silviculture, and ranching activities." § 1344(f)(1)(A). As the statute and regulations both require, the disputed activities "must be part of an established (i.e., on-going) farming, silviculture, or ranching operation" and they cease to be "established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii). The Cundiffs' wetlands fail both requirements: before the Cundiffs took over and began their landclearing activities, the land had not been used as a farm for many decades prior and no one disputes that no farming could take place on the wetlands without significant changes—the entire point of Rudy Cundiff's activities was to significantly alter the wetlands to make them arable. Of course, such activities are not universally impermissible, but they do require a permit. Thus the farmland exception does not apply.

Nor does the drainage ditch maintenance exception apply. Section 1344(f)(2)(C) exempts the discharge of dredged or fill material "for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches." Note the difference in language between the two clauses: while the exemption applies to the maintenance *or construction* of farm or stock ponds or irrigation ditches, it only applies to the *maintenance* of drainage ditches and not their construction. The

regulations make this explicit. 33 C.F.R. § 323.4(a)(3) (observing exemption for "the maintenance (but not construction) of drainage ditches"). The district court found that the Cundiffs' activities were not limited to merely maintaining existing and functioning ditches, but instead involved both digging brand new ones and excavating ditches that had no function or ability to function as drainage ditches, and neither can be considered mere "maintenance."

Even if the Cundiffs' activities fell within either the farming or drainage ditch maintenance exemptions, they would still have been required to get a permit under the "recapture provision," 33 U.S.C. § 1344(f)(2), which states that a permit is still required whenever a dredging activity has "as its purpose bringing an area of the navigable waters into a use to which it was not previously subject," and the "flow or circulation of navigable waters may be impaired or the reach of such waters reduced." *Id.* To fall within this provision, both elements must be met. *See Macklin*, 361 F.3d at 949. Here, Rudy Cundiff freely admitted that he excavated the ditches to convert the wetlands into being suitable for crop production, and the method by which he attempted to do so—drying the wetlands out to transform them into farmland—obviously would, if successful, "impair[]" the "flow or circulation of navigable waters" or "reduce" their reach.  33 U.S.C. § 1344(f)(2). So, even if the Cundiffs' activities fell into one of the exemptions above, they still would have been required to have obtained a permit under the recapture provision. And because the government has thus satisfied its prima facie case against the Cundiffs by proving all five required elements, the district court properly granted summary judgment on their liability.

### C.    *The District Court Did Not Abuse Its Discretion in Imposing Remedies*

Remediation orders are reviewed for abuse of discretion. *See United States v. Norris*, 937 F.2d 286, 288 (6th Cir. 1991). Courts have considered three factors when evaluating remediation or restoration proposals: (1) whether the proposal would confer maximum environmental benefits, (2) whether it is achievable as a practical matter, and (3) whether it bears an equitable relationship to the degree and kind of wrong to be remedied. *United States v. Deaton ("Deaton II")*, 332 F.3d 698, 714 (4th Cir. 2003)

(citing cases). Here, the district court analyzed each factor based on the evidence in rejecting the Cundiffs' proposals and accepting the government's proposed restoration plan. The government's plan consists primarily of filling in the ditches on the northern tract, cutting branches in the ditches on the southern tract to restore the wetlands, planting trees on the southern tract to replace the ones the Cundiffs removed, restoring previous plant and animal life, and placing riprap (loose rocks assembled as a foundation) where the northern tract's ditches enter Caney Creek to prevent erosion. The Cundiffs' challenge to the district court's judgment is largely a quarrel with the court's factual findings, which were not clearly erroneous, though they also argue that the government's plan will not allow them to see sufficient future profits. The Cundiffs also claim that what they were already doing would have led to the restoration of the wetlands.

Taking this latter contention first, the district court flatly rejected it, finding instead that the government's plan would "confer maximum environmental benefits." And while the amount of money that the Cundiffs might receive in the future is generally included as a factor in equity, the court also found that the Cundiffs' violations were "intentional, flagrant, egregious, and openly defiant, so as to militate against any equitable considerations." J.A. 51-52. Thus, in light of these findings and the Clean Water Act's goal of "restoring and maintaing the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the district court did not abuse its discretion in entering the remediation order.

**IV.**

The Cundiffs' counterclaims are rather nebulous, but they roughly fall into three categories: (A) Constitutional takings-based counterclaims alleging that the government's actions constituted an uncompensated taking without due process; (B) duty-based counterclaims alleging that the federal government owed them a mandatory duty to mitigate damage to their property caused by the acid water runoff from the nearby abandoned mine; and (C) tort-based counterclaims alleging liability for

the government's failure to fix the acid mine runoff or for the government's conduct in enforcing the Act. Each fails as a matter of law.

### A.     Takings Counterclaims

The Cundiffs claim that the governments' actions—either because of the remediation plan or because of the mine's drainage onto the Cundiffs' property—constituted an uncompensated taking without due process under the Fifth Amendment. The merits of this argument are specious,[10] but this claim has a bigger problem: The Tucker Act gives the Court of Federal Claims exclusive subject matter jurisdiction over takings claims seeking more than $10,000. 28 U.S.C. § 1491. Although the Cundiffs are not clear about how much they exactly seek, they seek more than $10,000,000 altogether. And the Cundiffs never specifically refuted that this jurisdictional threshold applies, and thus their takings counterclaims were properly dismissed.

### B.     Mandatory Duty Counterclaims

The Cundiffs assert that the federal government owed them a mandatory duty to prevent or remediate runoff from the mine from seeping onto their property under the Surface Mining Control and Reclamation Act ("SMCRA"). *See* 20 U.S.C. § 1270. Although the SMCRA grants a private right of action against the government for the failure to perform mandatory duties, *id.* at § 1270(a)(2); *see also* 5 U.S.C. § 702 (providing judicial review to persons who have suffered a legal wrong because of an agency action under the APA), it only authorizes abandoned mine reclamation activities on properties adversely affected by abandoned mines and "for which there is no continuing reclamation responsibility under State or other federal laws." *Id.* at § 1234. It furthermore envisions that—while paid for by fees collected from current mine operators—the mine reclamation projects will be undertaken by *state* governments. *See id.* at § 1201(f). When a state submits a mine reclamation program consistent with the

---

[10]It is unlikely that a takings claim would succeed: the damage the Cundiffs complain of results from the acid mine drainage from the nearby abandoned mine, which is owned by some third party and has never been owned or operated by the federal government.

SMCRA, that state is given the "exclusive responsibility and authority" to implement it. *Id.* at § 1235(d). Kentucky has an approved reclamation program, so the responsibility and authority over remediating pollutants that drain out of abandoned coal mines like the one near the Cundiffs' property does not lie with the federal government. Thus, the Cundiffs' mandatory duty counterclaims were properly dismissed.

### C.    Tort Counterclaims

The Federal Tort Claims Act confers jurisdiction on federal courts to hear cases only "under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Tort Claims Act thus neither *creates* causes of action against the United States nor provides a means of enforcing federal statutory duties. Rather, it "constitutes consent to suit and is fundamentally limited to cases in which a private individual [would be liable] under like circumstances." *Myers v. United States*, 17 F.3d 890, 894 (6th Cir. 1994).  To succeed, the Cundiffs must therefore show that they have pleaded facts by which a private individual would be liable under Kentucky law. They have not.

The gravamen of the Cundiffs' argument is that the abandoned coal mine seeps acid water onto their property so the United States should be liable. But, as observed above, the United States has never owned nor operated that mine, and there is no cognizable legal theory in Kentucky by which someone could be sued for failing to stop fluid from draining out of some third-party's abandoned coal mine.  Insofar as the Cundiffs assert that though a private individual would not be liable yet nevertheless the federal government should be, the response is two-fold. First, Kentucky has never recognized such a lawsuit, and, second, there cannot be a universal common-law duty on the federal government to clean up anything and everything that adversely affects someone's property, even when caused by third-parties. Although the Cundiffs cite a plethora of cases where liability attached, *see, e.g.*, *City of Ashland v. Smith*, 340 S.W.2d 208 (Ky. 1960); *Louisville & Nashville R.R. v. Bush*, 336 S.W.2d 578 (Ky. 1960), *Cissell v. Grimes*, 383 S.W.2d 128 (Ky. 1964), in each the liable party either owned the source

of the problem or affirmatively created it. Neither is the case here. Thus, the district properly dismissed the tort counterclaims.

## V.

We AFFIRM the district court's grant of summary judgment to the government and assignment of penalties to the Cundiffs, along with the district court's dismissal of the Cundiffs' counterclaims against the government.