IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 30, 2022 Session

**LUNA LAW GROUP, PLLC v. RICHARDSON M. ROBERTS**

**Appeal from the Chancery Court for Davidson County
No. 17-688-I Patricia Head Moskal, Chancellor**

_____

**No. M2021-00699-COA-R3-CV**

_____

In this breach of contract case, Appellee law firm sued Appellant former client for unpaid attorneys' fees. Appellant argued that the statute of limitations and the doctrine of laches barred Appellee's breach of contract claim. Alternatively, Appellant argued that the unpaid attorneys' fees were unreasonable. The trial court held that neither the statute of limitations nor the doctrine of laches barred Appellee's breach of contract claim, and that Appellee's attorneys' fees were reasonable. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and CARMA DENNIS MCGEE, JJ., joined.

James D. Kay, Jr., Michael A. Johnson, and F. Dalton Thompson, III, Nashville, Tennessee, for the appellant, Richardson M. Roberts.

R. Horton Frank, Nashville, Tennessee, for the appellee, Luna Law Group, PLLC.

**OPINION**

**I. Background**

In 2005, Appellant Richardson M. Roberts constructed a large dam on his property in Humphreys County, Tennessee. The dam impounded the waters of Snake Creek, which flowed into Tumbling Creek and the Duck River. Mr. Roberts built the dam without obtaining permits for its construction. Following construction, Mr. Roberts faced substantial legal challenges concerning the environmental impact of the dam and his

alleged violations of environmental laws.

On February 20, 2007, Mr. Roberts engaged Appellee Luna Law Group, PLLC ("Luna Law") to defend a citation issued by the Tennessee Wildlife Resource Agency ("TWRA") and to plan for a potential enforcement action against Mr. Roberts by the Tennessee Department of Environment Conservation ("TDEC").[1] The parties later expanded the scope of representation to include defending Mr. Roberts in other enforcement actions from multiple state and federal agencies. The original agreement for representation was confirmed in the Engagement Letter Agreement (the "Agreement") that both parties signed. The Agreement provided that Luna Law's attorneys, J. W. Luna, an environmental law expert, William H. Farmer, a renowned litigator, and Michael D. Pearigen, a prominent legal writer and environmental law expert, would represent Mr. Roberts. By signing the Agreement, Mr. Roberts agreed to pay Luna Law for Mr. Luna's, Mr. Farmer's, and Mr. Pearigen's legal services rendered at their hourly rates, as stated in the Agreement. Mr. Roberts also agreed to provide a $10,000.00 refundable retainer to Luna Law that would be maintained on a monthly basis. Luna Law agreed to provide monthly invoices for services rendered.

In July 2009, Mr. Farmer left Luna Law and joined the Jones, Hawkins & Farmer Law Firm ("JHF"). After Mr. Farmer's departure, JHF and Luna Law worked together to represent Mr. Roberts. Mr. Farmer and William B. Hawkins, another attorney with JHF, continued to serve as Mr. Roberts' litigators, while Luna Law worked closely with hired environmental experts to resolve the environmental regulatory law issues. As discussed further, *infra*, Mr. Roberts expressed his displeasure when Mr. Farmer moved to JHF and cited concerns that such move would increase his legal fees.

Of note, Luna Law represented Mr. Roberts, *inter alia*, in both a federal criminal investigation and a federal civil enforcement action, discussed at length *infra*. After October 2010, Mr. Roberts ceased paying Luna Law's invoices despite the firm's continued representation of him. By June 2011, Mr. Roberts owed Luna Law $136,283.28. For reasons discussed further, *infra*, on July 8, 2011, Mr. Luna wrote to Mr. Roberts indicating Luna Law's intent to withdraw from representation. By order entered October 12, 2011, Luna Law withdrew from representing Mr. Roberts in the federal civil enforcement action. By this time, the federal criminal investigation had ended. The $10,000.00 retainer remained in Luna Law's trust account after the firm withdrew from representation. Mr. Roberts never paid Luna Law for services rendered from October 2010 through May 2011.

On July 5, 2017, Luna Law filed a complaint in the Chancery Court for Davidson County (the "trial court") against Mr. Roberts for breach of contract. In the complaint, Luna Law alleged that Mr. Roberts breached the Agreement and owed the firm

---

[1] We note that, at the time of the engagement, the name of the firm was Farmer & Luna, PLLC.

$136,283.28. On August 23, 2017, Mr. Roberts filed an answer to the complaint. In pertinent part, Mr. Roberts alleged that Luna Law's claims were barred by the applicable statute of limitations and the doctrine of laches. Mr. Roberts also denied owing Luna Law $136,283.28.

On July 17, 2018, Mr. Roberts filed a motion for summary judgment, discussed further *infra*, arguing that the trial court should dismiss the action because Luna Law failed to bring the breach of contract claim within the six-year statute of limitations. On September 24, 2018, Luna Law filed a response in opposition to the motion. By order of October 10, 2018, the trial court denied the motion. A few days before trial, Mr. Roberts filed a motion to alter or amend the summary judgment order, seeking to have it set aside. On October 5, 2020, the first day of trial, Luna Law filed a response to the motion to alter or amend. Although the trial court heard arguments on the motion as a preliminary matter, it declined to rule on it before proceeding with the trial.

The trial occurred on October 5 and 6, 2020. The trial court heard testimony from the following witnesses: (1) Mr. Luna; (2) Mr. Pearigen; (3) David Jackson, a geological hydrologist and environmental expert; (4) Robert E. Boston, Mr. Roberts' expert witness concerning attorney's fees; (5) Mr. Hawkins; and (6) Mr. Roberts. Fifty exhibits were entered into evidence, with the parties stipulating to their authenticity and admissibility.

At the close of Luna Law's proof, Mr. Roberts moved for involuntary dismissal of the breach of contract claim based on both the statute of limitations and the doctrine of laches. On October 6, 2020, Mr. Roberts filed a written motion for involuntary dismissal and also renewed his motion to alter or amend. Ruling from the bench, the trial court denied the motion for involuntary dismissal on the statute of limitations but reserved ruling on the motion as it concerned the ground of laches until hearing all of the proof at trial. The trial court denied Mr. Roberts' renewed motion to alter or amend. Mr. Roberts renewed these motions again at the close of all proof. Mr. Roberts also moved for involuntary dismissal of Luna Law's breach of contract claim arguing that Luna Law did not meet its burden to prove that the disputed fees were reasonable. The trial court again denied the motion for involuntary dismissal on the breach of contract claim and reserved ruling on Mr. Roberts' oral motion to deny pre-judgment interest under the doctrine of laches.

On May 25, 2021, the trial court entered its memorandum and final judgment. For reasons discussed *infra*, the trial court: (1) confirmed its denial of the motions to alter or amend and for involuntary dismissal; (2) found that Mr. Roberts breached the Agreement; (3) concluded that Luna Law proved by a preponderance of the evidence that the overall fees billed to Mr. Roberts and the outstanding fees of $136,283.28 were reasonable; (4) denied Luna Law's claim for pre-judgment interest; (5) ordered that the $10,000.00 retainer held in trust be applied to the outstanding fee amount; and (6) awarded Luna Law a judgment against Mr. Roberts for $126,283.28. Mr. Roberts appeals.

- 3 -

## II. Issues

Mr. Roberts raises two issues on appeal, which we restate as follows:[2]

1. Whether the trial court erred when it found that Luna Law's breach of contract claim was not time-barred.

2. Whether the trial court erred when it found that Luna Law's attorneys' fees were reasonable.

## III. Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. 2008).

We note that, because "trial courts are able to observe witnesses as they testify and to assess their demeanor, . . . trial judges [are best suited] to evaluate witness credibility." ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999) (citing ***State v. Pruett***, 788 S.W.2d 559, 561 (Tenn. 1990); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991)); *see also* ***Richards v. Liberty Mut. Ins. Co.***, 70 S.W.3d 729, 733 (Tenn. 2002) ("As this Court has repeatedly emphasized, a reviewing court must give 'considerable deference' to the trial judge with regard to oral, in-court testimony as it is the trial judge who has viewed the witnesses and heard the testimony."). As such, "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells***, 9 S.W.3d at 783 (internal citations omitted). Accordingly, we do not disturb the trial court's finding that it "generally credit[ed] the testimony of each of the fact witnesses who testified at trial." We also give deference to the trial court's findings that Mr. Jackson, the geological hydrologist, "had scientific, technical, and specialized environmental knowledge that substantially assisted the [c]ourt in understanding the difficult and complex issues involved in this representation in determining the reasonableness of the attorney's fees requested," and "that Mr. Boston, [was] a legal expert [with] extensive experience and specialized knowledge representing clients in complex litigation matters and managing that representation."

## IV. Analysis

---

[2] Luna Law does not appeal the trial court's denial of its claim for pre-judgment interest.

## A. Whether Luna Law's Breach of Contract Claim was Time-Barred

Mr. Roberts first argues that the trial court erred in allowing Luna Law's breach of contract claim to proceed. He alleges that such claim is time-barred under the applicable statute of limitations and the doctrine of laches, both of which he pled as affirmative defenses in the answer to the complaint. We address each argument in turn.

### 1. Statute of Limitations[3]

Under Tennessee Code Annotated section 28-3-109(a)(3), a breach of contract claim must be filed within six years after the cause of action accrues. Tenn. Code Ann. § 28-3-109(a)(3). The cause of action accrues on the date the contract is breached. *Greene v. THGC, Inc.*, 915 S.W.2d 809, 811 (Tenn. Ct. App. 1995). The nature of each contract determines whether it is subject to a single breach or multiple breaches. "Entire" contracts give rise to a single breach and/or cause of action while "severable" contracts give rise to separate breaches and causes of action that may accrue at different times. *Id.* "Under Tennessee law there is no precise definition of when a contract is entire or when it is severable." *Id.* (citing *James Cable Partners, L.P. v. City of Jamestown*, 818 S.W.2d 338, 344 (Tenn. App. 1991), *cert. denied*, 502 U.S. 1032 (1992)). However, this Court has previously concluded that a contract is entire "'[w]here services are continuously rendered over an extended period of time'" and when the contract "'does not fix the term of employment nor the time when compensation shall be payable[.]'" *Murray v. Grissim*, 290 S.W.2d 888, 893 (Tenn. Ct. App. 1956) (citing *In re Swanson's Est.*, 42 N.W.2d 228, 230 (S.D. 1950)); *see also In re Estate of McClanahan*, 471 S.W.2d 555, 558 (Tenn. Ct.

---

[3] As noted above, Mr. Roberts argued his statute of limitations defense in a motion for summary judgment, a motion to alter or amend the trial court's order denying the motion for summary judgment, and in an involuntary motion to dismiss. It is unclear which of the trial court's rulings concerning the statute of limitations Mr. Roberts now appeals. For completeness, we note our standard of review as to each. A trial court's decision to grant a motion for summary judgment presents a question of law. Therefore, our review is *de novo* with no presumption of correctness afforded to the trial court's determination. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Although Mr. Roberts characterized his second motion as one to alter or amend, the trial court correctly treated it as a Rule 54.02 motion to revise because its order was not final. *See Harris v. Chern*, 33 S.W.3d 741, 743 (Tenn. 2000) ("[T]he Tennessee Rules of Civil Procedure . . . allow for motions 'to alter or amend a judgment,' Tenn. R. Civ. P. 59.04, or motions 'to revise' a non-final partial judgment, *see* Tenn. R. Civ. P. 54.02."). As this Court has explained before, "[a] trial court's ruling on a Rule 54.02 motion to revise is reviewed for an abuse of discretion standard." *Johnson v. Tanner-Peck, L.L.C.*, No. W2009-02454-COA-R3-CV, 2011 WL 1330777, at *8 (Tenn. Ct. App. Apr. 8, 2011). "When reviewing a discretionary decision, the trial court's findings of fact are reviewed de novo, and they are presumed correct unless the preponderance of the evidence is otherwise. The trial court's legal conclusions, however, are reviewed de novo with no presumption of correctness." *Id.* (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 525 (Tenn. 2010)). Concerning Mr. Roberts' motion for involuntary dismissal, the trial court's factual findings are again reviewed de novo with a presumption of correctness, while its legal conclusions are reviewed de novo with no presumption of correctness. *Spearman v. Shelby Cnty. Bd. of Educ.*, 637 S.W.3d 719, 731-32 (Tenn. Ct. App. 2021), *appeal denied* (May 14, 2021).

App. 1971) (reaffirming and adopting the rationale of *Murray*). Thus, "[a] contract is entire when the 'promises of both parties are interdependent and relate to the same subject matter.'" *Greene*, 915 S.W.2d at 811 (quoting *James Cable Partners, L.P.*, 818 S.W.2d at 344). Contrastingly, we have determined that a contract is severable "if several things are to be performed under [the] contract and the consideration is apportioned to each of the items[.]" *McGhee v. Shelby Cnty. Gov't*, No. W2012-00185-COA-R3-CV, 2012 WL 2087188, at \*5 (Tenn. Ct. App. June 11, 2012) (citing *Hogan v. Coyne Int'l Enter. Corp.*, 996 S.W.2d 195, 200 (Tenn. Ct. App. 1998)). "In other words, a contract is severable where each part is so independent of each other as to form a separate contract, and severable contracts are, in legal effect, independent agreements about different subjects, though made at the same time." *McGhee*, 2012 WL 2087188, at \*6 (quoting 17A C.J.S. *Contracts* § 441 (2012)); *see also Greene*, 915 S.W.2d at 811 (quoting *James Cable Partners, L.P.*, 818 S.W.2d at 344).

Mr. Roberts argues that the Agreement was severable, that he breached the Agreement each time he refused to pay Luna Law's invoices, and that the last invoice he received was dated June 7, 2011. Thus, Mr. Roberts alleges that the statute of limitations for his final breach expired on June 7, 2017, one month *before* Luna Law filed its complaint, thus resulting in the complaint being barred by the six-year statute of limitations. Conversely, Luna Law argues that the Agreement was entire, and that Luna Law's cause of action for Mr. Roberts' breach accrued when Luna Law's legal services were either completed or terminated, which was not earlier than July 8, 2011 but not later than October 12, 2011. Thus, Luna Law argues that its filing of the complaint on July 5, 2017, was timely.

The trial court concluded that Luna Law's services under the Agreement were "continuous and of an undetermined duration." Thus, the trial court held that the Agreement "and the relationship between [Luna Law] and [Mr. Roberts] was entire and not severable." We agree. Turning to the Agreement, it is clear that the "'promises of both parties [were] interdependent and relate[d] to the same subject matter.'" *Greene*, 915 S.W.2d at 811 (quoting *James Cable Partners, L.P.*, 818 S.W.2d at 344). Indeed, the Agreement provided that Luna Law would represent Mr. Roberts "with regard to the dam controversy in Humphreys County, Tennessee[.]" Absent from the Agreement are any "independent agreements about different subjects[.]" *McGhee*, 2012 WL 2087188, at \*6 (quoting 17A C.J.S. *Contracts* § 441 (2012)); *see also Greene*, 915 S.W.2d at 811 (quoting *James Cable Partners, L.P.*, 818 S.W.2d at 344). Thus, at its core, the Agreement was a contract for Luna Law to represent Mr. Roberts in the enforcement actions against him related to his building the dam on his property. Although Luna Law's representation began on February 20, 2007, the date Mr. Roberts executed the Agreement, there was no specific date by which representation would end. Rather, the Agreement provided that Luna Law's representation would end when: (1) Mr. Roberts terminated the representation; or (2) Luna

Law terminated the representation.[4]  This further demonstrates the parties' intent that Luna Law's representation would be continuously rendered over a period of time.  *See Murray*, 290 S.W.2d at 893 (citing *In re Swanson's Est.*, 42 N.W.2d at 230).

Despite the foregoing, Mr. Roberts alleges that the Agreement was severable because it "apportion[ed] the consideration among *monthly* billings and payments . . . ." (Emphasis in original).  He also argues that "[t]he plain language of the contract shows that both parties intended that [Luna Law] would bill, and be paid, on a monthly basis."  Mr. Roberts relies on the following portion of the Agreement to support his argument:

> I request a refundable retainer of $10,000 to be maintained on a monthly basis.  You will receive an invoice monthly.  At the end of the engagement and after deducting the last month's fees and costs, then the unused balance of the $10,000 retainer will be refunded to you.
>
> Each of our attorneys and legal assistants maintains detailed time records of services performed.  This practice results in a monthly billing statement showing, on a daily basis, the amount of time spent, the work performed, by whom, and the total amount charged.

As shown above, the Agreement required Luna Law to provide monthly invoices to Mr. Roberts and explained that these invoices would show "the amount of time spent, the work performed, by whom, and the total amount charged."  However, on this Court's review, there is no language in the Agreement requiring Mr. Roberts to pay such invoices by a date or time certain.  For example, there is no provision in the Agreement (or the invoices) requiring Mr. Roberts to pay Luna Law's invoices within 30-days of receipt.  *Cf. Cohen v. Demonbreun*, No. M2014-02403-COA-R3-CV, 2015 WL 5766681 (Tenn. Ct. App. Sept. 30, 2015).[5]  Rather, the Agreement provided for immediate payment of "all fees and

---

[4] Presumably Luna Law's representation would also end when the pending litigation against Mr. Roberts concluded, although that is not explicitly stated in the Agreement.

[5] Mr. Roberts argues that the case before us is similar to *Cohen* and urges this Court to conclude that the Agreement was severable, as the *Cohen* Court held.  In *Cohen*, a doctor entered into a written agreement with an attorney to provide services as an expert witness in a medical malpractice case.  *Cohen*, 2015 WL 5766681, at *1.  In the agreement, the attorney agreed to pay the doctor "within 30 days of receipt of the statement requesting such payment."  *Id.*  Each invoice the doctor furnished to the attorney also contained the following language: "Terms: Net 30 days."  *Id.*  Accordingly, per the agreement, the attorney was required to pay the doctor within 30-days of each invoice.  Based on the foregoing, this Court concluded that the agreement was severable, and that the attorney could commit more than one breach.  *Id.* at *5.  Given that the parties' agreement conditioned the attorney's liability on the receipt of an invoice, we concluded that "a breach occurred and a cause of action accrued on the 31st day following receipt of an invoice for services and non-payment."  *Id.*  (citation omitted).  Mr. Roberts argues that, like the agreement in *Cohen*, the parties' Agreement was severable because "the [Agreement] clearly states that [Luna Law] was to bill—and be paid—monthly . . . ."  For reasons discussed, *supra* and *infra*, we disagree that *Cohen* is similar to the case before us, and that the parties' Agreement was severable.

interest previously incurred and all costs previously advanced" *on termination of the attorney-client relationship*, i.e., on termination of the Agreement. As this Court has previously opined, when a contract for employment provides that the employee shall be paid at the conclusion of the job, such contract is entire. *Murray*, 290 S.W.2d at 893.

Witness testimony supports the conclusion that the Agreement was entire. Mr. Luna testified that it was Luna Law's practice that the amount on the invoices remained payable "until they were either paid in full or paid in part and accepted by the firm in satisfaction of the obligation to pay the fees and expenses owed." He further testified that Mr. Roberts did not pay each invoice "promptly," but that he paid the invoices whenever "he decided to," and that Luna Law accepted the payments as they came. When asked on cross-examination whether Mr. Luna *expected* payment within 30-days, Mr. Luna replied: "No, I did not expect payment in 30 days. Did I want payment within 30 days? Absolutely. Did I expect [Mr.] Roberts was going to pay within 30 days? No." Mr. Pearigen substantiated Mr. Luna's testimony when he explained that Luna Law "didn't have a firm policy in terms of when bills had to be paid." Mr. Roberts even testified that he "probably did not pay the bills on a regular basis, you know, every 30 days." Indeed, trial exhibit 5 shows that Mr. Roberts did not consistently remit payment each month. Given the foregoing language in the Agreement, and for the reasons discussed, *supra*, we affirm the trial court's conclusion that the Agreement was entire and not severable.

Having affirmed the trial court's conclusion that the Agreement was entire, we turn to the question of when Mr. Roberts breached it. When an attorney executes an entire contract to provide legal services, the statute of limitations begins to run only on the completion of such legal services. *Murray*, 290 S.W.2d at 893 (citing *Potts v. Village of Haverstraw*, 93 F.2d 506, 508 (2d Cir. 1937); 6 Williston on Contracts, section 2028, p. 5692); *see also Greene*, 915 S.W.2d at 811. Thus, the trial court correctly concluded that Luna Law's cause of action accrued when its "services were either completed or terminated." According to the record, and as the trial court found, Luna Law's representation of Mr. Roberts ended not earlier than July 8, 2011, i.e., the date Mr. Luna wrote to Mr. Roberts of Luna Law's intent to withdraw from representation, and not later than October 12, 2011, i.e., the date the district court entered the order of withdrawal in the federal civil enforcement action. Thus, July 8, 2017 is the *earliest* date on which the statute of limitations would have expired for Luna Law's breach of contract claim against Mr. Roberts. Because Luna Law filed its complaint on July 5, 2017, three days before the earliest expiration of the six-year statute of limitations, we affirm the trial court's conclusion that the statute of limitations did not bar Luna Law's breach of contract claim.

### 2. Doctrine of Laches

Mr. Roberts next argues that the trial court erred when it declined to apply the doctrine of laches to Luna Law's breach of contract claim. "[T]he application of the doctrine . . . lies within the discretion of the trial court[,] and it will not be reversed except

upon a showing of an abuse of discretion." ***Brown v. Ogle***, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000) (citing ***John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.***, 715 S.W.2d 41, 46 (Tenn. 1986)). "The essence of the defense [of laches] is that a party has unreasonably and prejudicially delayed the asserting of a claim." ***Archer v. Archer***, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995) (citing 11 Tenn. Jur. Equity § 37 p. 42 (Supp. 1994)). Thus, a fact finder must "determine whether it would be inequitable or unjust to enforce the claimant's rights." ***Assocs. Asset Mgmt. LLC v. Blackburn***, No. W2016-00801-COA-R3-CV, 2017 WL 1077060, at *3 (Tenn. Ct. App. Mar. 22, 2017) (citing ***Archer***, 907 S.W.2d at 416).

"Generally, the doctrine of laches applies to actions not governed by a statute of limitations," but it may be applied despite a relevant statute of limitations when the plaintiff is guilty of *gross* laches. ***Assocs. Asset Mgmt. LLC v. Blackburn***, No. W2016-00801-COA-R3-CV, 2017 WL 1077060, at *3 (Tenn. Ct. App. Mar. 22, 2017) (citing ***Dennis Joslin Co. v. Johnson***, 138 S.W.3d 197, 201 (Tenn. Ct. App. 2003)). As discussed, *supra*, Luna Law's breach of contract claim is governed by a six-year statute of limitations. Accordingly, it was Mr. Roberts' burden to prove gross laches to succeed under this defense.

We infer from the trial court's overall ruling that it declined to apply laches as a bar to the entire breach of contract claim but allowed it as to Luna Law's claim for prejudgment interest. Indeed, the trial court agreed with Mr. Roberts that "he would be prejudiced by the accumulation of interest resulting from [Luna Law's] delay in filing suit." Finding that the delay "resulted in the accumulation of considerable prejudgment interest that nearly equal[ed] the amount of the attorneys' fee claim," the trial court concluded that laches should apply to bar Luna Law's collection of prejudgment interest. Luna Law does not appeal this ruling. However, Mr. Roberts appeals the trial court's decision to not apply laches to Luna Law's *entire* breach of contract claim.

As this Court has explained,

> [w]hether the defense of laches is applicable presents a mixed question of law and fact. ***Freeman*** [***v. Martin Robowash, Inc.***, 457 S.W.2d 606, 611 (Tenn. Ct. App. 1970)]. The facts must establish negligence and [i]nexcusable delay on the part of the party asserting a claim and some resulting prejudice or injury to the party pleading laches. ***Id.*** The resulting question of law is whether, in view of the facts, it would be inequitable or unjust to the defendant to enforce the party's right. ***Id.*** Prejudice includes the loss of evidence, expenditure of money, change of value, or a change of a party's right. ***Consumer Credit Union v. Hite***, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990).

*Archer*, 907 S.W.2d at 416.

Turning to the record, there is no evidence to demonstrate that Luna Law's delay in filing the breach of contract claim was grossly negligent or inexcusable. Mr. Luna initially testified that he waited to file the lawsuit against Mr. Roberts because he hoped that Mr. Roberts would eventually remit payment for Luna Law's legal services. However, it appears the gravamen of the delay was because Mr. Luna did not want to sue a former client. Indeed, Mr. Luna testified that he "agonized" over the decision, but ultimately decided to file the suit because Luna Law "did the work pursuant to [the Agreement]" and deserved to be paid for the same.

Mr. Roberts does not explicitly argue that Luna Law's delay in filing the complaint was grossly negligent or inexcusable. Rather, his appellate brief focuses on the alleged resulting prejudice from the delay. Specifically, he argues that "[t]he passage of time prejudiced [his] defense" because witnesses failed to remember "facts key to [Mr.] Roberts' defenses." Although Mr. Roberts' appellate brief provides several citations to both deposition testimony and the trial transcript where witnesses presumably could not "recall key facts or important events," Mr. Roberts fails to show how his defense was prejudiced by such failed recollection. On this Court's review, the record contains ample witness testimony and fifty exhibits concerning Luna Law's representation of Mr. Roberts and the ensuing dispute over attorneys' fees. From our review, we conclude that the trial court did not abuse its discretion when it denied Mr. Roberts' laches defense as to the entire breach of contract claim.

**B. Whether Luna Law's Attorneys' Fees were Reasonable**

Having affirmed the trial court's conclusion that neither the statute of limitations nor the doctrine of laches barred Luna Law's breach of contract claim, we turn to Mr. Roberts' alternative argument that Luna Law's attorneys' fees were unreasonable. As the trial court explained in its final order, "[i]n the context of a claim for breach of an attorney's fees contract, the attorney is entitled to recover the compensation agreed to by contract, provided it is fair at inception and entered in good faith." *See Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn. 1998); *Peoples Nat. Bank of Washington v. King*, 697 S.W.2d 344, 346 (Tenn. 1985). To enforce a contract for attorney's fees, the attorney must show that: (1) the client fully understood the contract's meaning and effect; (2) the attorney and client shared the same understanding of the contract; and (3) the terms of the contract are just and reasonable. *Alexander*, 974 S.W.2d at 694. Mr. Roberts does not dispute that he fully understood the Agreement and that he and Luna Law shared the same understanding of the Agreement. Accordingly, the sole issue is whether Luna Law's attorney's fees were reasonable.

We are mindful of the standard we must apply when reviewing a trial court's determination that an attorney's fee award is reasonable. As the Tennessee Supreme Court has explained:

The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," ***United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co.***, 703 S.W.2d 133, 137 (Tenn. 1986), and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. ***Killingsworth v. Ted Russell Ford, Inc.***, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. ***Kline v. Eyrich***, 69 S.W.3d 197, 203 (Tenn. 2002); ***Shamblin v. Sylvester***, 304 S.W.3d 320, 331 (Tenn. Ct. App. 2009). We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. ***Henderson v. SAIA, Inc.***, 318 S.W.3d 328, 335 (Tenn. 2010); ***Keisling v. Keisling***, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005). The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, ***Williams v. Baptist Mem'l Hosp.***, 193 S.W.3d 545, 551 (Tenn. 2006); ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998), and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." ***Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.***, 249 S.W.3d 346, 358 (Tenn. 2008); *see also **Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010).

***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011).

Rule 1.5(a) of the Rules of Professional Conduct ("RPC") provides factors to consider when determining the reasonableness of an attorney's fee, to-wit:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a). We note that "no single factor found within RPC 1.5 merits special emphasis over the other factors in determining a reasonable fee[,] . . . [but] the trial court may conclude that certain factors merit greater weight under the unique circumstances of a particular case." *Wright*, 337 S.W.3d at 186. Here, the trial court applied the correct legal standard when it relied on RPC 1.5(a) to conclude that Luna Law's attorneys' fees were reasonable. Accordingly, our review concerns whether the trial court "'based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to [Mr. Roberts.]'" *Id.* at 176 (quoting *Konvalinka*, 249 S.W.3d at 358).

In its very thorough final order, the trial court delineated numerous findings of fact to support its conclusion that Luna Law's attorney's fees were reasonable. As an initial matter, the trial court found, and it is undisputed, that Mr. Luna and Mr. Pearigen were highly respected attorneys with extensive knowledge of environmental and regulatory laws. Although it is also undisputed that Mr. Roberts' defense was complex and very technical, a review of its intricacies is integral to determining whether the trial court erred when it concluded that Luna Law's attorneys' fees were reasonable.

The record shows that Luna Law's scope of representation quickly broadened beyond the initial Agreement as it became clear that Mr. Roberts faced a litany of civil and criminal charges from several state and federal agencies concerning the construction of the dam.[6] Of note, the record shows that, a few months after engaging Luna Law, Mr. Roberts was served with a federal grand jury subpoena, and a federal investigation into Mr. Roberts for alleged criminal violations of the Clean Water Act ensued. If convicted, Mr. Roberts faced a potential five-year prison sentence. In 2009, the U.S. Government, at the request

---

[6] Indeed, the following governmental agencies either threatened or pursued legal action against Mr. Roberts: (1) the Tennessee Wildlife Agency; (2) TDEC; (3) the civil and criminal divisions of the Tennessee Attorney General's Office; (4) the Humphreys County District Attorney; (5) the United States Attorney for the Middle District of Tennessee; (6) the U.S Environmental Protection Agency ("EPA"); (7) the U.S. Army Corps of Engineers; (8) the Tennessee Bureau of Investigation; (9) the Federal Bureau of Investigation; (10) the U.S. Department of Justice Environmental Criminal Division; and (11) the U.S. Department of Justice Environmental Defense Division.

of the EPA, filed an enforcement action in federal district court against Mr. Roberts for alleged *civil* violations of the Clean Water Act. The U.S. sought removal of the dam and remediation of the site as well as significant civil penalties against Mr. Roberts upwards of $123 million dollars. As the trial court found, in the face of these allegations, "Mr. Roberts was adamant that he would not plead guilty to a felony, serve a prison term, or remove the dam."

The record shows that each attorney at Luna Law brought a unique skillset that proved valuable to Mr. Roberts' defense. Mr. Luna had a reputation as a leading strategist for handling complex environmental and regulatory matters, and he served as the managing attorney for Mr. Roberts' defense team. Although Mr. Pearigen was also regarded as an environmental law expert, he was a meticulous, detail-oriented, and highly skilled practitioner and persuasive legal writer. While not an expert in environmental law, Mr. Farmer was regarded as a skilled trial lawyer and was responsible for the litigation aspect of Mr. Roberts' defense. The record also shows that, within a few months of being hired by Mr. Roberts, Mr. Luna hired Mr. Jackson and Richard Young, experienced and respected environmental experts, as consultants to assist with Mr. Roberts' defense.[7]

According to the record, it became clear that Mr. Roberts' defense hinged on a finding that the waters, which the dam impounded, be deemed "non-jurisdictional." As Mr. Jackson testified, if the waters were "jurisdictional," they would be subject to regulation under the Clean Water Act. Thus, as the trial court found, the environmental experts' "primary task was to study the lake created by Mr. Roberts' dam and the surrounding area, and determine whether the waters impounded by the dam and the wetlands below the dam were 'jurisdictional' waters of the United States or the State of Tennessee." To make this determination, "Mr. Jackson and Mr. Young set up more than four hundred data collection points across the site" to study the dam and the wetlands below the dam. To complicate matters further, the record shows that the law in this area was unsettled at the time as the United States Supreme Court had recently issued its opinion in **Rapanos v. United States**, a 4-4-1 opinion defining different tests for determining whether waters were "jurisdictional" under the Clean Water Act. *See generally* **Rapanos v. United States**, 547 U.S. 715 (2006).

The record shows that, for 45 months, Mr. Jackson and Mr. Young collected data on the dam and the surrounding area. Mr. Luna, Mr. Pearigen, and Mr. Jackson's testimony demonstrates that Mr. Luna and Mr. Pearigen worked closely and tirelessly with the environmental experts to build a "massive technical case" in the face of unsettled law. Mr. Jackson testified that, during this time, Mr. Luna and Mr. Pearigen were instrumental in synthesizing the data collected into persuasive arguments in favor of Mr. Roberts, to-wit:

---

[7] Richard Whiteside was also brought on as an expert to review Mr. Jackson's and Mr. Young's reports and to issue his own report.

- 13 -

Q:  How did Mr. Luna and Mr. Pearigen go about working with you to take all this data and put it in a form that could be used to persuade and advocate for a successful outcome for Mr. Roberts?

A:  I think there are two primary ways.  One thing that I've seen Mr. Luna do in every matter I've worked with him on is place a narrative with different personalities at a strategic time.  Letting the director of water pollution at TDEC know of a finding, maybe communicating that to the commissioner.  That was one -- as the story developed, and our data collection lasted for 45 months.  So this was a continual learning process on our part.  But as facts came in and helped support one narrative or another, I think [Mr. Luna] was responsible for letting that be known in a discreet way that didn't compromise knowledge of the facts.  And then the other instrument was the expert report.

Q:  Was getting the word out, if you will, in a discreet way, are these communications between Mr. Luna and decision makers behind these enforcement actions?

A. Yes.

As discussed further, *infra*, the above-mentioned expert reports were later filed in the civil enforcement action.

Ultimately, Mr. Jackson concluded that the waters the dam impounded were non-jurisdictional.  In his testimony, he opined that these findings were "crucial," not only to the civil enforcement action, but also to the criminal investigation against Mr. Roberts as well.  Indeed, Mr. Jackson testified that he conveyed his findings to the attorney responsible for the criminal investigation when the attorney visited the dam.  Mr. Jackson testified that he showed the attorney "every data collection point [he] had, which took a few hours, [] tracing through the woods going from monitoring well to water level recorder of a spring to another location" where the team was collecting data.  Mr. Pearigen similarly testified that, during the environmental experts' research, "the federal government made 17 different [site] visits," and that Mr. Jackson "was with them on each and every single one" and "had a lot of opportunity to [bend] their ear[.]"  Furthermore Mr. Jackson testified that he, along with Mr. Luna, Mr. Pearigen, and Mr. Farmer prepared a written letter to the U.S. Government concerning Mr. Jackson's conclusion that there was no permit required to build the dam and no basis for a criminal investigation and indictment.  In Mr. Jackson's opinion, that letter "added to the weight of evidence, along with the time that [he] spent with the criminal attorney on site, and perhaps other communications with the government."

In October 2010, the U.S. Government informed Mr. Roberts that it was not

- 14 -

pursuing criminal charges against him. As the trial court found, Mr. Roberts' defense team "celebrated this decision as a major success." As noted, *supra*, and as the trial court found, it was at this time that Mr. Roberts stopped paying Luna Law's invoices. By his own testimony, Mr. Roberts anticipated that, once the threat of criminal prosecution dissipated, and as his defense moved into the civil case, Mr. Luna would not be as involved and that "the billings should go down at that point." Mr. Roberts further testified that Mr. Luna's "greatest potential for impact . . . seem[ed] to be going away."

As noted above, although Mr. Roberts no longer faced criminal prosecution, he was still defending against the civil enforcement action. The record shows that, at such time, Mr. Farmer (who had moved to JHF) and Mr. Hawkins managed the upcoming depositions while Mr. Luna and Mr. Pearigen were responsible for "the strategies and the implementation of the complex environmental issues contained in the lawsuit." Despite Mr. Roberts' refusal to remit payment for Luna Law's services, the record shows that Luna Law continued to provide him meaningful legal representation. Luna Law's invoices from November and December 2010 show that Mr. Luna and Mr. Pearigen provided significant contributions to discovery matters, such as preparing questions for witness depositions, reviewing interrogatories, and reviewing Mr. Roberts' production of documents.[8] The record also demonstrates that, although Mr. Farmer and Mr. Hawkins led the litigation, Mr. Hawkins contacted Mr. Luna *the day before* Mr. Roberts' deposition and asked that Mr. Luna cover deposition preparation, which Mr. Luna did. Indeed, the record shows that Mr. Luna billed 11.40 hours on November 30, 2010 and 6.40 hours on December 1, 2010 for services related to Mr. Roberts' deposition. Luna Law's invoices covering these discovery matters totaled $45,635.00, and Mr. Roberts refused to remit payment.

As the trial court found, "[i]n early 2011, Mr. Roberts renewed his complaints about Luna [Law]'s legal fees." The trial court also found that "Mr. Luna asked Mr. Roberts to consider the role he wanted Luna [Law] to serve in the ongoing civil litigation." Indeed, the record contains emails from Mr. Luna to Mr. Roberts on January 28, 2011 and February 9, 2011 (both entered into evidence as trial exhibit 21), which show Mr. Luna asking Mr. Roberts for direction concerning Luna Law's role in the representation. The record also shows that Mr. Luna and Mr. Roberts met on February 11, 2011, to further discuss the issue. According to Mr. Luna's testimony, he brought invoices with him to review with Mr. Roberts, and the two discussed that Luna Law would continue to be responsible "for the strategies and the implementation of the complex environmental issues contained in that lawsuit." The record shows that Mr. Roberts requested Mr. Luna to provide more information in his personal billing entries. Despite Mr. Luna's and Mr. Roberts' discussion, Mr. Roberts' testimony at trial demonstrated that he believed the meeting was insignificant, that there was no resolution of the dispute concerning the November, December, and January invoices, and that, in Mr. Roberts' opinion, "the conversation went

---

[8] Luna Law's unpaid invoices from October 2010 through May 2011 were entered into evidence as trial exhibit 3.

so poorly that Mr. Luna stacked the court that month with billings." When asked if Mr. Luna and Mr. Roberts discussed upcoming charges, budgets, or estimates at this meeting, Mr. Roberts reiterated his discontent that Mr. Farmer left Luna Law and testified: "I mean, you know, if you're going to have to ultimately be dealing with two law firms, you're probably going to be paying twice as much money. ***And that wasn't my responsibility***." (Emphasis added).

At this time, Mr. Pearigen and Mr. Luna were working with the environmental experts to prepare the expert reports that confirmed Mr. Jackson's findings that the waters the dam impounded were non-jurisdictional. The trial court found that "Mr. Luna and Mr. Pearigen had worked quite closely with the environmental experts and best understood the data collected and how it supported Mr. Roberts' defense." The trial court also found that "Mr. Pearigen did the bulk of the work, translating the experts' technical findings and conclusions into persuasive written reports to advance Mr. Roberts' defense." The record supports the trial court's findings. Indeed, Mr. Jackson testified:

Q: Tell me the roles that Mr. Luna and Mr. Pearigen played in helping you prepare this report in the form that it has become.

A: Putting 45 months' worth of data and analysis, and rebutting the other experts, putting it into a form that tells a story, and a persuasive story, is challenging. This was a lot more work and a lot more challenging than writing a master's thesis. [Mr. Pearigen] was instrumental in that, as I said he's an excellent writer, he helped shape this narrative into something that had an edge. It wasn't just a dry recitation of findings, which it, in fact, is a dry recitation. But, [Mr. Pearigen], I won't say advocacy, but he shaped it toward more of an advocacy than just a factual report.

Q: What about Mr. Luna's role, was it more or less?

A: I would say it was less in terms of effort. [Mr. Luna] had comments. They were, as I remember, mostly focused toward stressing key points that he felt needed to be emphasized for the strategy that he was pursuing.

Mr. Pearigen described his role similarly, to-wit:

Q: Can you describe for the Court your role in helping them synthesize this information and put it together?

A: Well, my experience with technical people is they're extremely good, at least the ones we usually engaged, like these three gentleman, was that they're very good at what they do, but they're not necessarily good writers.

And what I did was basically help translate their findings and conclusions into something that is readable to an average person.

Mr. Jackson testified that he worked "some 200-plus hours" on the report and that Mr. Pearigen was working on the report with him "day and night" towards the end of the deadline. The record shows that Mr. Pearigen billed 135.70 hours on this matter between February 1 and March 7, 2011, the date the expert reports were due. Mr. Luna billed 30.40 hours during this time. In a March 14, 2011 letter that accompanied Luna Law's February 1 through March 7, 2011 invoice (entered into evidence as trial exhibit 24), Mr. Luna highlighted that, "[Mr.] Pearigen worked over 135 hours in assisting in the preparation of the reports, researching critical issues, and also assisting [Mr. Hawkins] in his efforts (over 50 of [Mr. Pearigen's] 135 hours were performed on weekends)." Mr. Luna also noted that he had "begun including more information in [his] personal time entries since [the two] met on February [11]." At trial, Mr. Roberts testified that Mr. Pearigen "did do a good job," and he acknowledged Mr. Pearigen's contribution to his defense. He also acknowledged that the majority of the $63,915.63 invoice, from February 1 through March 7, 2011, was from Mr. Pearigen's services in drafting the expert reports that were vital to his defense. Nevertheless, as the trial court found, "Mr. Roberts continued his complaints about the amount of fees billed and did not . . . pay for the fees incurred . . . for preparing the experts' reports."

By April 2011, the relationship between Mr. Roberts and Luna Law had deteriorated. In his testimony, Mr. Roberts admitted that he was "not communicating much with [Mr. Luna] at this point," and was mostly communicating with Mr. Hawkins. As the trial court found, "Mr. Luna, Mr. Pearigen, Mr. Farmer, and Mr. Hawkins met with Mr. Roberts to discuss his case and the division of labor between their firms." Around this time, Mr. Roberts directed Mr. Luna to minimize his involvement in the case. In an April 20, 2011 email to Mr. Luna (entered into evidence as trial exhibit 28), Mr. Roberts asked Mr. Luna to "reduce/discount" Luna Law's bills considering "the fact that [Luna Law] [was] not actively representing [Mr. Roberts] in [the] case as [was] Hawkins & Farmer." Mr. Roberts also stated that he did not believe Luna Law's billing or hours to be reasonable. Additionally, he complained that Mr. Luna's "political goodwill" that Mr. Roberts intended to benefit from "never materialized." Mr. Roberts again reiterated his discontent with Mr. Farmer leaving Luna Law before writing:

> So, you need to provide sincere consideration to my request. Not only for the benefits your firm will receive going forward, albeit with a limited amount of input from you, but in hindsight for what I know is the value I have provided your firm in the past. ***The one thing I insist upon is that my case not be compromised, nor my representation be diluted per these discussions. I have earned that***.

(emphasis added). Mr. Luna responded to Mr. Roberts' email in a letter dated April 25,

2011 (entered into evidence as trial exhibit 29). In pertinent part, Mr. Luna agreed that Mr. Hawkins and Mr. Farmer had transitioned into the lead attorney roles. Mr. Luna also explained the complicated nature of Mr. Roberts' defense and the services Luna Law had provided to him. Mr. Luna described how Luna Law had not increased its fees since Mr. Roberts' engagement of the firm four years prior. He also informed Mr. Roberts that he and his partners at Luna Law declined to provide Mr. Roberts an "after-the-fact discount" on his bills, but he invited Mr. Roberts to "identify any specific activity that [he] contend[ed] exceed[ed] [the] engagement," so that Mr. Luna could address each activity with him.[9] Noting Mr. Roberts' discontent with Luna Law's hourly rates, Mr. Luna suggested that Mr. Roberts consider proceeding without Luna Law's services, and he offered to provide names of other attorneys who could potentially replace the firm in Mr. Roberts' representation.

On May 2, 2011, via an email entered into evidence as trial exhibit 30, Mr. Luna informed Mr. Roberts of recent legal developments that could affect how the team handled his defense. Mr. Luna stated that he believed "additional significant research, legal analysis, and strategic thought" needed to be conducted soon, and he asked Mr. Roberts to decide who he wanted to "do this work." On May 11, 2011, as the trial court noted, "all of the lawyers, experts, and Mr. Roberts met to discuss the case. Mr. Luna, Mr. Pearigen, and Mr. Roberts also met separately that day." Mr. Roberts again reiterated his complaints concerning Luna Law's fees. The next day, Mr. Luna sent two follow-up emails to Mr. Roberts concerning the meetings. The first email, entered into evidence as trial exhibit 32, shows, as the trial court found, that Mr. Luna offered to discount his fees from December 2, 2010 (the day after Mr. Roberts' deposition) through March 31, 2011, by fifty percent, which amounted to a $10,780.00 reduction. Mr. Luna testified that he offered the discount to satisfy Mr. Roberts' complaint that some of Mr. Luna's services were "unnecessary compared to [Mr. Pearigen's]." In the second follow-up email (entered into evidence as trial exhibit 33), Mr. Luna outlined his and Mr. Farmer's conflicting opinions concerning Mr. Roberts' defense moving forward. As shown in exhibit 32, on May 17, 2011, Mr. Roberts rejected Mr. Luna's offer to reduce his fees, stating: "Your proposed fee reduction is right around 8% of the current bill . . . or 2% of what I have paid your firm in total. I dare to ask you if you think that is really fair or what I had in mind when I said 'make your discount reasonable.' Call me this afternoon and we will discuss." Despite Mr. Roberts' rejection of Mr. Luna's offer, the discount was applied to the last two invoices billed to Mr. Roberts.

The record shows that, on May 16, 2011, Mr. Roberts' defense team became aware of the U.S. Government's intention to file an extensive motion for summary judgment. Two days later, Mr. Luna and Mr. Farmer met to discuss the division of labor between their firms. Trial exhibit 34 (entered into evidence) shows the email chain between Mr. Farmer,

---

[9] It does not appear from the record that Mr. Roberts ever met with Mr. Luna to discuss specific entries.

Mr. Luna, Mr. Pearigen, Mr. Hawkins, and Mr. Roberts discussing the division. Mr. Farmer initially detailed the following: (1) he was "lead counsel and the quarterback"; (2) Mr. Luna would be called upon for services when needed by Mr. Farmer; (3) Mr. Farmer and Mr. Hawkins would draft the initial pretrial motions and send them to Mr. Pearigen for editing; (4) Mr. Luna would advise Mr. Farmer in advance of all communications with the consultants; and (5) in two weeks' time the entire team would "sit down together and map out a plan for duties and assignments for the rest of the [l]itigation." That day, Mr. Luna responded to the email, copying all of the attorneys and Mr. Roberts. Although, Mr. Luna stated that he generally agreed with the summary, he changed the third and fourth points to provide: (1) Mr. Farmer and Mr. Hawkins would draft the initial pretrial motions and send them to Mr. Pearigen and Mr. Luna for Mr. Pearigen's editing and Mr. Luna's review; and (2) Mr. Luna would advise Mr. Farmer of all communications related to the case with the consultants as soon as practical after the communication. As the trial court found and as Mr. Luna testified, Mr. Luna wanted to act as the "gatekeeper" between JHF and Luna Law because he knew "Mr. Farmer and Mr. Pearigen had incompatible practice styles, and Mr. Pearigen had declined to work 'for' or be supervised by Mr. Farmer." As the trial court noted, Mr. Roberts was not informed of this incompatibility.

On May 26, 2011, Mr. Luna emailed Mr. Roberts a copy of Luna Law's invoice for services rendered from April 1 through April 30, 2011. In this email, entered into evidence as trial exhibit 36, Mr. Luna asked Mr. Roberts if he desired to continue to use Luna Law's services "on an even more limited scope of representation," or if Mr. Roberts had "chosen to follow an alternative path of providing assistance to [his] litigators." As the trial court found, Luna Law's billing records do not reflect any time billed by either Mr. Luna or Mr. Pearigen after May 31, 2011. Luna Law's final invoice reflected that Mr. Roberts owed $136,283.28 for services rendered to him from October 1, 2010 through May 31, 2011.

By email of June 21, 2011 (entered into evidence as trial exhibit 38), Mr. Roberts again rejected Mr. Luna's offers. In pertinent part, Mr. Roberts declined to seek alternative representation stating that he would find himself "in virtually the same position [he] was in last time" in that he would "more or less have to pay another premium again for bringing yet another law firm into this representation against [his] wishes." Mr. Roberts again reiterated his complaints concerning Mr. Farmer's departure from Luna Law in 2009 and how he did not want to have to "pay the tuition once again to 'educate' yet another firm for the excessive billings from [Luna Law] when [he] was adamant in [Mr. Luna] lowering those costs."

As the trial court found, in a July 8, 2011 letter (entered into evidence as trial exhibit 39), Mr. Luna wrote to Mr. Roberts concerning his refusal to remit payment for services rendered. Mr. Luna offered to accept $100,000.00 and the balance of Mr. Roberts' trust account in satisfaction of the $136,283.28 owed. Mr. Luna explained that the offer remained open until Luna Law filed a motion to withdraw, a copy of which was provided to Mr. Roberts under separate cover. At trial, Mr. Luna testified that Luna Law withdrew

because

> [Mr. Roberts] had quit requesting that we do anything. Farmer & Hawkins, at that law firm, were no longer giving us assignments. So it was obvious that we had gone dormant – I'm going to use that phrase. Our work had gone dormant. And that's a horrible place for a lawyer to be. And we're of counsel in federal court. So we, you know, we needed to get out of that predicament.

The trial court found, and the record shows, that Mr. Hawkins, on behalf of Mr. Roberts, objected to Luna Law's draft motion to withdraw as being prejudicial to Mr. Roberts' defense. By agreement, Luna Law's withdrawal was delayed until October 12, 2011, when the federal district court entered an order granting the same.

The foregoing facts led the trial court to conclude "that the overall amount of the fees charged by Luna [Law] and the outstanding amounts owed under the Agreement [were] reasonable applying the Rule 1.5 factors." Specifically, the trial court held:

> Based on the testimony of Mr. Luna, Mr. Pearigen, and Mr. Jackson, Luna [Law] proved, and no conflicting testimony was offered, that Mr. Roberts' representation involved extremely complex, scientific, legal, and technical environmental issues, difficult liability issues were presented and the area of law regarding the test for "jurisdictional waters" was unsettled at the time, and substantial time and labor were required to defend Mr. Roberts' interests on multiple fronts, including civil, criminal, and enforcement actions that were being pursued simultaneously by both state and federal agencies. The proof also was unrebutted that the hourly fees charged by the Luna [Law] lawyers were reasonable, were less than the hourly fees charged by them in other cases, and were never increased during the more than four years that Luna [Law] provided representation to Mr. Roberts. All of the witnesses testified that the defense of Mr. Roberts involved high-stakes litigation where he faced significant civil penalties, potential criminal responsibility and imprisonment, and the substantial expense of removing the dam and restoring the land. It was agreed that an excellent outcome was achieved through a negotiated federal consent decree that limited the civil penalties, resulted in no criminal prosecution, imposed a monetary payment of specified restoration work, and did not require the removal of the dam.

As discussed at length, *supra*, the record supports the trial court's findings and conclusions. On this Court's review, it is clear that the trial court based its conclusion on an accurate and reasonable assessment of the evidence. *See **Wright**, 337 S.W.3d at 176 (quoting **Konvalinka**, 249 S.W.3d at 358).

Despite the foregoing, on appeal, Mr. Roberts argues that, although the trial court "considered some of the [Rule 1.5] factors, it failed to consider three large problems in [Luna Law's] representation of [Mr.] Roberts that show the unreasonableness of the underlying legal fees." Mr. Roberts first argues that Luna Law "was working on two very complex litigation matters during [Mr.] Roberts' case, the stress from which ultimately led" Mr. Pearigen to the hospital. Mr. Roberts also alleges that Luna Law "did not contribute during the case's most crucial moments, leaving [Mr.] Hawkins and [Mr.] Farmer responsible for the ultimate results." Finally, Mr. Roberts argues that Luna Law's, or more specifically, Mr. Luna's, "gross mismanagement and disturbing lack of communication directly and negatively affected the quality and efficiency of [Mr.] Roberts' representation." We address each argument in turn.

Concerning his first argument, Mr. Roberts alleges in his brief:

[D]uring [Mr.] Roberts' representation, [Luna Law] worked on two very large, complex cases, the Dickson County Landfill and TRA matters. The Dickson County Landfill matter was "a far more intense [case] in many ways than [Mr. Roberts'] case" and "actually overlapped timewise with a lot of [Roberts'] project." Similarly, the TRA matter "was also extremely complicated" and had "critical moments" during [Mr.] Roberts' case. The TRA matter settled in the fall of 2010, requiring the work of all of [Luna Law's] members, right before [Mr.] Roberts' case reached its most critical moments. The stress caused by these three cases was largely why [Mr.] Pearigen [was admitted into the hospital] in the summer of 2011. [Luna Law's] inability to manage [Mr.] Roberts' case and the TRA and Dickson County Landfill matters forced [Mr.] Hawkins to hire [Steve] Sheppard to assist in drafting the response to the government's motion for summary judgment, increasing [Mr.] Roberts' fees by tens of thousands of dollars to get [Mr.] Sheppard up to speed on the case.

(Internal citations omitted). To the extent Mr. Roberts argues that Luna Law's representation in the TRA matter precluded him from receiving favorable representation, we conclude that the record demonstrates otherwise. Indeed, as discussed at length, *supra*, in the months leading up to the fall of 2010, Mr. Luna and Mr. Pearigen worked tirelessly with the environmental experts to craft Mr. Roberts' highly complex and technical defense. The record further shows that these efforts likely resulted in the U.S. Government declining to criminally prosecute Mr. Roberts in October 2010.

Equally unsupported is Mr. Roberts' argument that Mr. Hawkins was "forced" to hire Mr. Sheppard to draft the response to the motion for summary judgment due to Mr. Luna's "inability to manage" Mr. Roberts' case. Not only is this argument unsupported by the record, but it is unsupported by Mr. Roberts' own appellate brief. We recall that the team learned of the impending motion for summary judgment on May 16, 2011, and it was

- 21 -

filed on June 6, 2011. As Mr. Roberts notes in his appellate brief, "all of the fees underlining [Luna Law's] claim were billed from November 29, 2010, to June 7, 2011,[10] *when [Mr.] Luna was essentially irrelevant*." (Emphasis added). By Mr. Roberts' own admission, Mr. Luna was "essentially irrelevant" in the weeks leading up to the filing of the motion for summary judgment. Although we decline to characterize Mr. Luna as "irrelevant," the record reflects that, by April 2011, he was no longer the lead attorney on the case, *at Mr. Roberts' request*. We recall Mr. Roberts' testimony that, by April 2011, his communications with Mr. Luna had dwindled, and he instead contacted Mr. Hawkins regarding his case. Indeed, in his April 20, 2011 email to Mr. Luna, Mr. Roberts explicitly stated, "[Y]our firm is not actively representing me in this case as is Hawkins & Farmer." By his response on April 25, 2011, Mr. Luna agreed that Mr. Farmer and Mr. Hawkins were the leads on the case. The record also shows that, in the weeks leading up to the U.S. Government's filing of the motion for summary judgment, Mr. Luna repeatedly asked Mr. Roberts if and/or how he wanted to use Luna Law's services, but received very little response from Mr. Roberts except for his complaints concerning the fees already accrued. As discussed, *supra*, in the days following the U.S. Government's notice of the impending motion for summary judgment, it was again reiterated to all of the attorneys and to Mr. Roberts that Mr. Farmer was "lead counsel and the quarterback." Accordingly, there is ample evidence in the record to show that, when the team learned of the motion for summary judgment, Mr. Luna was not managing Mr. Roberts' case, *at Mr. Roberts' request*.

Mr. Roberts' allegation that Mr. Hawkins was forced to hire Mr. Sheppard last minute to draft a response to the motion for summary judgment because Mr. Pearigen "disappeared" is also unsupported by the record. We note that Mr. Sheppard was an environmental law professor at the University of Arkansas when he was hired as a consultant for Mr. Roberts. From the record, it appears that Mr. Hawkins first contacted Mr. Sheppard on May 3, 2011. When asked at trial about this initial communication, Mr. Hawkins testified that he first reached out to Mr. Sheppard "in a capacity of . . . if we tried this case and it went to the [S]ixth [C]ircuit, . . . that we would likely ask that it be taken up with the Supreme Court." In short, Mr. Hawkins testified that he initially contacted Mr. Sheppard as a consultant on "appellate issues," but that Mr. Sheppard's role changed and he assisted with the "very technical aspects of the . . . environmental pleadings" when Mr. Hawkins and Mr. Farmer "figured out . . . that [Mr. Pearigen] was MIA."

Although Mr. Hawkins testified that he anticipated *Mr. Pearigen* was going to draft a response to the motion, Mr. Hawkins' billing entries suggest that he turned to *Mr. Sheppard* for assistance *immediately* after receiving notice of the motion. As an initial matter, the record shows that Mr. Hawkins and Mr. Farmer ceased billing for communications with Mr. Pearigen and Mr. Luna after May 17, 2011. The record further

---

[10] We note that this is factually inaccurate. Luna Law's unpaid invoices are for services rendered from October 1, 2010 through May 31, 2011.

shows that Mr. Hawkins' second communication with Mr. Sheppard was on May 16, 2011, *the day Mr. Roberts' team was informed of the impending motion for summary judgment.* Indeed, Mr. Hawkins billed for "emails with counsel for DOJ; telephone calls with Steve Sheppard; research other cases where Cirino has filed motions for summary judgment; telephone call with attorney who argued the Cundiff case; telephone calls with Steve Sheppard; conference call with client." The record shows that "Cirino" was Paul Cirino, the lead trial attorney for the U.S. Department of Justice ("DOJ") in the civil enforcement action. It also appears that the "Cundiff case" is **United States v. Cundiff**, 555 F.3d 200 (6th Cir. 2009), a Sixth Circuit Court of Appeals case interpreting the Clean Water Act in the wake of the **Rapanos** decision. The **Cundiff** case concerned the U.S. Government's civil lawsuit against Rudy and Seth Cundiff, landowners in Kentucky, for alleged violations of the Clean Water Act. **Id.** at 204-05. Of note, that case was decided on the district court's grant of the U.S. Government's motion for summary judgment. **Id.** at 205. Thus, it appears from his billing entry that Mr. Hawkins had multiple calls with Mr. Sheppard the same day he was researching both Mr. Cirino's previously filed motions for summary judgment and a recent case that was similar to Mr. Roberts', which was decided on a motion for summary judgment.

Notably, Mr. Hawkins' billing records do not show that he contacted Mr. Pearigen after learning of the motion for summary judgment. However, Mr. Pearigen's May 17, 2011 billing entry reflects that he contacted Mr. Farmer, the lead attorney for Mr. Roberts' defense, and informed Mr. Farmer that he was available for a conference call concerning the motion. Indeed, Mr. Pearigen's billing entry shows that he engaged in a telephone conference with Mr. Farmer, Mr. Hawkins, and the two attorneys representing the DOJ that day. Interestingly, Mr. Hawkins' billing entry shows that he emailed *Mr. Sheppard* after this telephone conference. As mentioned, *supra*, Mr. Pearigen last billed Mr. Roberts the following day, May 18, 2011, for, in pertinent part, his "preparation of revisions to Government's Proposed Stipulation and e-mail same to B. Farmer, W. Hawkins and J. W. Luna."

Mr. Hawkins' subsequent billing entries demonstrate a continued close working relationship with Mr. Sheppard at the same time he was consulting with the environmental experts. On May 20, 2011, Mr. Hawkins billed for "[e]mails with Steve Sheppard; telephone calls with client." Similarly, on May 23, 2011, he billed for "[t]elephone call with Sheppard; send CD and letter to Sheppard; emails with Sheppard; review materials to send to Sheppard; tc with client." On May 24, 2011, Mr. Hawkins billed for: "Telephone conference with David Jackson; review letter from DOJ and respond with email regarding same; emails with Sheppard." Again, on May 31, 2011, Mr. Hawkins billed for "[t]elephone call with David Jackson; emails with David Jackson; emails with Richard Young; emails and telephone call with Steve Sheppard." This activity continued into June when Mr. Hawkins billed on June 1, 2011 for "[e]mails with Shep[p]ard; emails with Richard Young; emails with David Jackson" and again on June 3, 2011, for "[e]mail from Richard; review document Richard sent . . . extended telephone call with Sheppard in

Arkansas." On June 6, 2011, the U.S. Government filed its motion for summary judgment. Mr. Hawkins' billing entry from June 7, 2011 reflects that he had a telephone call with Mr. Roberts, sent emails to the environmental experts and Mr. Sheppard, reviewed the motion for summary judgment at length, and had a telephone call with Mr. Jackson. Most notably on this day, Mr. Hawkins billed for "emails with Sheppard re: ideas for response; telephone call with Sheppard." By Mr. Pearigen's own testimony, he was not hospitalized until mid-June, well after communications with Mr. Hawkins and Mr. Farmer ceased, after Mr. Hawkins had already initiated a close working relationship with Mr. Sheppard, and after the motion for summary judgment was filed. Indeed, as the trial court found, the billing records "indicate that JHF intended to and did rely on Mr. Sheppard to respond to the [U.S. G]overnment's summary judgment motion."

We note that, although Mr. Hawkins testified that his initial communications with Mr. Sheppard concerned appellate issues and trying the case before the Sixth Circuit, neither Mr. Hawkins nor Mr. Farmer billed for research concerning the Sixth Circuit until *August* 2011, after Mr. Roberts filed his response to the motion for summary judgment. Indeed, on August 23, 2011, Mr. Farmer billed for: "Review Sheppard drafts related to jurisdictional questions; follow-up conference with Will re Sixth Circuit issue on burden of proof, research same." Similarly, on August 30, 2011, Mr. Hawkins billed, in pertinent part, for: "Telephone call with Steve Sheppard re: motions; take pictures at lake (NC); review memo from Sheppard re: 6th Circuit position on polygraph refusal . . . ." The foregoing evidence contradicts Mr. Roberts' argument that Mr. Hawkins was forced to hire Mr. Sheppard to assist in drafting the response to the motion for summary judgment. Indeed, such evidence not only suggests that Mr. Hawkins was not "forced" to hire Mr. Sheppard last minute, but also suggests that Mr. Hawkins may have hired Mr. Sheppard as a replacement for Mr. Pearigen and/or Luna Law when he received notice of the impending motion for summary judgment.

Mr. Roberts' second argument as to why Luna Law's attorneys' fees were unreasonable is that "[Mr.] Hawkins and [Mr.] Farmer, not [Luna Law], obtained the ultimate favorable result."[11] As an initial matter, Mr. Roberts fails to show why such alleged fact should preclude Luna Law from receiving payment for the legal services it provided. That issue aside, the record shows that, although Mr. Farmer and Mr. Hawkins ultimately negotiated the settlement in the civil enforcement action, Luna Law's previous efforts likely contributed significantly to the negotiation. Aside from Luna Law's substantial assistance with discovery matters, discussed *supra*, the record shows that the expert reports, which Mr. Pearigen and Mr. Luna helped prepare, were essential to the settlement. Indeed, when asked at trial how he believed the expert reports contributed to the settlement, Mr. Jackson testified: "I think the effect of [the] reports collectively was

---

[11] In this portion of his argument, Mr. Roberts again alleges that Mr. Hawkins was "[l]eft out to dry" by Mr. Pearigen and was forced to hire Mr. Sheppard. For the numerous reasons discussed above, the record does not support this argument.

- 24 -

like dropping an anvil on the government's factual case, particularly on their experts. They had nothing to compare with our data set. They had nothing to compare with the impact of the reports the way they were put together and presented." Likewise, Mr. Pearigen opined that the reports likely "got the federal government to the negotiating table," or significantly contributed "to getting the feds to start looking toward negotiating instead of suing." When asked how he would credit Mr. Luna's and Mr. Pearigen's roles in preparing the reports, Mr. Jackson testified: "With deference to [Mr.] Farmer and [Mr.] Hawkins, this result wouldn't have happened without [Mr. Luna] and [Mr. Pearigen]. I don't think there is anybody else in the state that could have produced this result." Aside from the civil enforcement action, the record shows that Luna Law also likely contributed substantially to the U.S. Government's decision not to pursue criminal charges against Mr. Roberts. As discussed at length, *supra*, while Mr. Jackson was collecting data and corresponding with the attorney responsible for the criminal investigation, Mr. Luna was "getting the word out" and communicating the technical findings with the decision-makers behind the enforcement actions.[12] Indeed, although Mr. Roberts alleges otherwise, the foregoing evidence supports the trial court's finding that

> it was the combined efforts of the two firms over multiple years, including Luna [Law]'s extensive work in consulting with a team of experts to develop data and prepare key reports, that contributed to the positive outcome of the case and those efforts cannot be separated. The work of both firms was necessary to achieve the ultimate outcome.

Mr. Roberts' final argument is that Mr. Luna failed to effectively manage the case, which led to excessive legal fees.[13] He requests that this Court "reverse the trial court and remand the case with instructions to reduce the more than $1 million billed by [Luna Law] by at least 15% (reducing [Luna Law]'s recovery to $0, due to [Luna Law's] gross mismanagement, lack of candor and communication to [Mr.] Roberts, excessive and duplicative billing, and block billing, among other unreasonable billing practices." (Citations omitted). For reasons discussed *supra* and *infra*, the record does not support this argument.

---

[12] We note that Mr. Roberts downplayed the criminal investigation at trial. He testified that he was excited the U.S. Government chose not to pursue criminal charges "not because [he] avoided five years in jail . . . [but] because the government's leverage potentially was done with them having to use a shakedown criminal trial in order to get [him] to settle on the civil side. . . . It's not for any other reason than that. That's why [he] was excited." Regardless of Mr. Roberts' attitude toward a potential tenure in federal prison, the fact remains that he was served with a federal grand jury subpoena related to alleged criminal violations of the Clean Water Act, which carried a possible five-year prison sentence if convicted, and Luna Law's efforts helped prevent such conviction.

[13] Relying on Mr. Boston's expert testimony, Mr. Roberts again argues that keeping Mr. Pearigen's hospitalization from "the legal team and the client 'increased the cost and the efficiency significantly' and that, because [Mr.] Pearigen was counsel of record at the time, [Mr.] Luna should have notified [Mr.] Roberts of [Mr.] Pearigen's status." For the reasons discussed, *supra*, the record does not support Mr. Roberts' argument that Mr. Pearigen's hospitalization increased his legal fees.

In pertinent part, Mr. Roberts argues that "the mismanaged legal team was toxic," and that there was significant conflict between Mr. Luna, Mr. Pearigen, and Mr. Farmer that led to an increase in legal fees.[14] However, the record shows that Mr. Luna, Mr. Pearigen, and Mr. Farmer worked as a collaborative team for many years before Mr. Roberts engaged Luna Law as legal counsel and also during Mr. Roberts' case. Although Mr. Roberts alleges that Mr. Farmer's departure from Luna Law was a result of the "fractured" relationships between these attorneys, the record does not support such allegations. As discussed, *supra*, Mr. Farmer left Luna Law in 2009. The record shows that the impetus for Mr. Farmer's departure was his desire to pursue an appointment as the U.S. Attorney for the Middle District of Tennessee. While pursuing that appointment, Mr. Farmer joined JHF, the law firm where his son practiced, as an attorney "Of Counsel." When Mr. Farmer was not appointed U.S. Attorney, he joined JHF as a full-time attorney, where he continued to represent Mr. Roberts. Nevertheless, it seems from the record that Mr. Roberts has consistently blamed Mr. Luna for Mr. Farmer's departure and cited the same as an excuse for his refusal to pay Luna Law's attorneys' fees. Indeed, in a November 11, 2009 email from Mr. Roberts to Mr. Luna (entered into evidence as trial exhibit 17), Mr. Roberts wrote:

> [Mr. Luna], my point is that if [Mr. Farmer] leaves the case from *your* firm for reasons beyond my control or desire, then you have *not* complied with the terms of our engagement and it is your responsibility to bring another lawyer up to speed. In other words, what did the monies I spend with [Mr.] Farmer go toward other than the ultimate defense of my case. What do you think is fair?

(Emphasis in original). As discussed, *supra*, Mr. Roberts reiterated this complaint many times to Mr. Luna throughout the representation. We note that attorneys are not confined to one law firm for their entire career. Indeed, unless contractually obligated, attorneys are free to pursue other opportunities that may allow for career growth and development, and most do. Regardless of the reason behind Mr. Famer's departure, Mr. Roberts chose to continue to use Luna Law's legal services as provided in the Agreement, and Luna Law should be compensated for providing these services.

Mr. Roberts also argues that Luna Law's "shocking billing practices" should result in this Court's reduction of Luna Law's attorneys' fees. Although Mr. Roberts argues that Luna Law engaged in duplicative billing, he provides only five examples of Mr. Luna's and Mr. Pearigen's billing entries as support for this argument. On this Court's review,

---

[14] Mr. Roberts relies on Mr. Boston's expert testimony as proof that Luna Law's fees were unreasonable, that some of Luna Law's billing was duplicative, and that the case suffered from mismanagement. On review of Mr. Boston's testimony, we agree with the trial court's finding that "Mr. Boston did not offer an opinion as to the specific services that were duplicative, the amount of fees deemed excessive, or the amount of an appropriate reduction for the claimed mismanagement."

those entries amount to only 2.50 hours billed between the two attorneys for a total of $915. Mr. Roberts argues that "[t]hese billing practices clearly call for a reduction" and cites as support for his argument the New York district court case ***Anthony v. Franklin First Fin., Ltd.***, 844 F. Supp. 2d 504 (S.D.N.Y. 2012). In ***Anthony***, plaintiffs sued their former employer under the Fair Labor Standards Act. ***Id.*** at 505-06. Although "the parties reached a settlement as to the [p]laintiffs' damages, [they] were unable to settle the issue of [p]laintiffs' statutory attorneys' fees." ***Id.*** at 506. Not only is ***Anthony*** not binding authority in Tennessee, but the facts of the case are readily distinguishable from the case *sub judice*. In ***Anthony***, the court found that some of the attorneys' fees hours were "excessive or unnecessary." ***Id.*** at 509. For example, the court noted that the attorneys billed 16 hours for administrative tasks, 23.3 hours for updating and revising a spreadsheet related to damages, and 84 hours for internal meetings between the attorneys. ***Id.*** The foregoing led the court to reduce the attorneys' fees by 20%. Such billing practices are obviously distinguishable from the 2.50 hours Mr. Luna and Mr. Pearigen billed. If Mr. Roberts believed other billing entries to be duplicative, it was his burden to bring those duplicative billings to this Court's attention in his briefing. *See* Tenn. R. App. P. 27 (7)(A) (stating that the appellant's brief shall contain an argument with "appropriate references to the record . . . .").

Mr. Roberts also argues that Luna Law's fees should be reduced because the firm engaged in "block billing." As Mr. Roberts argues in his appellate brief, "block billing refers to the 'time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" (Citing ***Oakley v. City of Memphis***, No. 06-2276 A/P, 2012 WL 2682755, at *3 (W.D. Tenn. June 14, 2012), *report and recommendation adopted*, No. 06-2276-STA-TMP, 2012 WL 2681822 (W.D. Tenn. July 6, 2012), *aff'd*, 566 F. App'x 425 (6th Cir. 2014)). Although Mr. Roberts cites several federal cases as support for a reduction in fees due to "block billing," we have found no Tennessee cases that have reduced attorney's billings on the ground of "block billing". Regardless, this Court has reviewed the "block billing" entries Mr. Roberts references and agrees with the trial court's finding that

> many of those entries reflect Mr. Pearigen's time[, and] [b]ased on a review of the descriptions provided in those entries, the Court [is] able to determine what tasks were performed, including such time-consuming tasks as responding to discovery, preparing for depositions, conferring with the experts, conducting research and analyzing issues, and reviewing and preparing revisions to expert reports.

This Court has also reviewed Mr. Farmer's and Mr. Hawkins' invoices from JHF, and we note that, despite their billing entries being *less* detailed than Mr. Luna's and Mr. Pearigen's entries, Mr. Roberts did not seem to take issue with JHF's billing practices as he paid their attorneys' fees in full.

We agree with the trial court that the circumstances of this case do not "warrant an across the board reduction in fees as requested, where all of the unpaid fees incurred were directly attributable to Luna [Law]'s representation of Mr. Roberts in the multiple enforcement actions." Indeed, as outlined in great detail above, Luna Law provided Mr. Roberts with quality representation in a complex and technical legal matter for four years. It is reasonable that representation in a case of this magnitude would result in substantial attorneys' fees, as they did for Mr. Roberts. The record shows that, when Mr. Roberts complained of these fees and requested a discount, Mr. Luna attempted to cooperate with him, reducing the number of hours he personally billed, cutting his bills in half, offering to meet with Mr. Roberts to discuss individual billing entries, and even offering to settle for $100,000.00. Mr. Roberts accepted none of these compromises. The record shows that despite the fact that Mr. Roberts demanded (and received) high-quality representation from Luna Law, he simply did not want to pay for these services. For the many reasons discussed above, we conclude that Mr. Roberts is responsible for paying the outstanding $136,283.28 in attorney's fees, and we affirm the trial court's conclusion that Luna Law is entitled to same.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's final order. The case is remanded for such further proceedings as are necessary and consistent with this opinion. Costs of the appeal are assessed to the Appellant, Richardson M. Roberts, for all of which execution may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE